## RECORD NO. 14-1854

In The
# United States Court Of Appeals
For The Fourth Circuit

## REBECCA GROVES; JONATHAN HADDEN,

**Plaintiffs/Appellants,**

v.

## COMMUNICATION WORKERS OF AMERICA,
### Communication Workers of American District 3;
## COMMUNICATION WORKERS OF AMERICA, LOCAL 3702,

**Defendants/Appellees,**

and

## AT&T MOBILITY LLC,

**Defendant.**

_____

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## AT ANDERSON

_____

## BRIEF OF APPELLEES

_____

Tessa A. Warren, Esq.
Quinn, Connor, Weaver, Davies & Rouco LLP
3516 Covington Highway
Decatur, Georgia 30032
404/299-1211
twarren@qcwdr.com

Nancy Jo Thompson, Esq.
P. O. Box 4025
303 E. Greenville Street
Anderson, South Carolina 29622
864/226-7222
nancyjo@tandplegal.com

*Counsel for Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1854__    Caption: __Groves, et al. v. Communications Workers of America, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Communications Workers of America, CWA District 3__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: _____        Date: 9/4/14

Counsel for: Appellee CWA

## CERTIFICATE OF SERVICE
***************************

I certify that on 9/4/14 the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Brian P. Murphy
C. Alexander Cable
Stephenson & Murphy, LLC
207 Whitsett Street
Greenville, South Carolina  29601
Alex@StephensonMurphy.com
Brian@StephensonMurphy.com

_____              9/4/14
(signature)                            (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1854__        Caption: _Groves, et al. v. Communications Workers of America, et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Communications Workers of America, Local 3702_
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                    ☐ YES ☑ NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: _____          Date: 9/4/14

Counsel for: Appellee CWA Local 3702

## CERTIFICATE OF SERVICE
***************************

I certify that on ___9/4/14___ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Brian P. Murphy
C. Alexander Cable
Stephenson & Murphy, LLC
207 Whitsett Street
Greenville, South Carolina 29601
Alex@StephensonMurphy.com
Brian@StephensonMurphy.com

_____          9/4/14
      (signature)                (date)

- 2 -

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT .................................................... 1

ISSUES PRESENTED ...................................................................... 1

STATEMENT OF THE CASE ......................................................... 2

SUMMARY OF ARGUMENT ....................................................... 9

ARGUMENT .................................................................................. 10

    I.    Groves and Hadden did not Establish the Required Elements
        of a Hybrid § 301 Action ............................................................ 10

        A. The District Court Did Not Create a New Requirement for
            Hybrid § 301 Claims but Correctly Applied Well-
            Established Hybrid § 301 Standards to Facts of this Case ..... 10

        B. Neither CWA nor Local 3702 Prevented Plaintiffs from
            Timely Pursuing Contractual Remedies Against AT&T
            Mobility ................................................................................. 16

    II.   Neither CWA nor Local 3702 Acted in an Arbitrary Manner
         Or in Bad Faith ......................................................................... 21

        A.   CWA and Local 3702 Are Not Liable for Each Other's
            Conduct……………………………………………….. 21

        B.   CWA's Conduct was not Arbitrary in Breach of the
            Duty of Fair Representation……………………………... 24

        C.   Local 3702's Conduct was not Arbitrary in Breach
            of the Duty of Fair Representation………………………26

i

D.    Neither CWA nor Local 3702 Engaged in Bad
      Faith Conduct……………………………………………….27

CONCLUSION……………………………………………………………… 30

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Cases**                                                                    **Pages**

*Adkins v. Intern'l Union of Elec., Radio & Mach. Workers*,
   AFL-CIO-CLC, 769 F.2d 330 (6th Cir. 1985) ............................... 13,14

*Air Line Pilots Ass'n v. O"Neill*, 499 U.S. 65, 67 (1991) ................... 21, 24, 26, 27

*Ayala v. Union de Tronquistas de Puerto Rico, Local 901*,
   74 F.3d 344, 346 (1st Cir. 1996).................................................20

*Carbon Fuel Co. v. United Mine Workers*, 582 F.2d 1346 (4th Cir. 1978),
   *affirmed* 444 U.S. 212, 217 (1979) .......................................22

*Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1243 (7th Cir. 1997) ........28

*De Arroyo v. Sindicato de Trabajadores Packinghouse AFL-CIO*,
   425 F.2d 281, 283 (1st Cir. 1970)...........................................25

*DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 165 (1983)............11

*Doyle v. United Airlines, Inc., 914* F.Supp.2d 325, 338
   (E.D.N.Y. Dec. 20, 2012........................................................12

*Dutrisac v. Caterpillar Tractor Co.*, 749 F.2d 1270, 1274 (9th Cir.1983) .............25

*English v. Whitfield*, 858 F.2d 957, 961 (4th Cir. 1988)..........................................16

*Fay v. Teamsters Local Union No. 553*, 67 F.Supp.2d 86 (E.D.N.Y.)............. 15, 16

*Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953) .........................................21

*Grant v. United Fed'n of Teachers*, 2014 WL 978444, *9 (E.D.N.Y. 2014)..........12

*Graphic Communications Local 4 (San Francisco) (San Francisco Newspaper Printing Co.)*, 249 N.L.R.B. 88 (1980) ...............................................29

*Griffin v. International Union, United Auto., Aerospace and Agr. Implement Workers of America, UAW*, 469 F.2d 181, 183 (4th Cir. 1972)..........................26

*Harris v. Schwermann Trucking Co.*, 668 F.2d 1204, 1206 (11th Cir. 1982)........24

*Hines v. Anchor Motor Freight*, 424 U.S. 554, 562-63, (1976) ..............................11

*Hoyle v. United Auto Workers Local Union 5285, et al.*, 444 F.Supp.2d 467 (W.D.N.C. Aug. 3, 2006) ....................................................................22

*Katsaros v. Transit-Mix Concrete Corp.*, 585 F.Supp. 576 (S.D.N.Y. 1984).........15

*Marcelus v. Corrections Corp. of America/Correctional Treatment Facility*, 540 F.Supp.2d 231, (D.D.C. 2008) .......................................................18

*Miller v. General Motors Corp.*, 675 F.2d 146, 150 (7th Cir.1982)........................18

*Miller v. Local 50, American Federation of Grain Millers*, 468 F.Supp. 193 (D. Neb. 1979).........................................................17

*Nicolaisen v. Chicago & Northwestern Transp. Co.*, No. 89-2430, 1991 WL 237619, *11 (D.Kan. Oct. 30, 1991) .................................................18

*Noble v. U.S. Postal Service*, 537 F.Supp. 2d 210, 216 (D.D.C. March 24, 2008) .........................................................................20

*Panrell v. United Mine Workers of America, Intern. Union*, 872 F.Supp. 1502 (N.D.W.Va. Jan. 20, 1995) ....................................................29

*Reed v. United Trans. Union*, 488 U.S. 319, 328 (1989)........................................11

*Robesky v. Qantas Empire Airways Ltd*, 537 F.2d 1082 (9th Cir. 1978) ................26

*Ruzicka v. general Motors Corp,* 523 F.2d 306, 310 (6th Cir. 1975)...................... 25

*Samosky v. United Parcel Service,* 944 F.Supp.2d 479, 514-15
   (S.D.W.Va. May 6, 2013) ...................................................................22

*Shimman v. Frank,* 625 F.2d 80, 97 (6th Cir. 1980)................................................22

*Simo v. Union of Needletrades, Indus. & Textile Employees*, 322 F.3d 602
   (9th Cir. 2003)....................................................................................27

*Smith v. Local 7898, United Steelworkers of America*, 834 F.2d 93, 96
   (4th Cir. 1987)....................................................................................26

*Sparks v. Abe May Packing Co.*, 1989 WL 105939 (6th Cir. 1989) ................. 14, 15

*Spellacy v. Airline Pilots Association-Int'l*, 156 F.3d 120, 126
   (2d Cir. 1998).....................................................................................28

*StarTran, Inc.,* 2002 WL 35018627 (September 16, 2002)....................................19

*Thompson v. Aluminum Co. of America*, 276 F.3d 651, 658-59
   (4th Cir. 2002)....................................................................................26

*United Mine Workers v. Coronado Coal Co.*, 259 U.S. 344 (1922) ......................22

*Vaca v. Sipes*, 386 U.S. 171 (1967) ...................................................... 11, 12, 20, 24

*Vencl v. International Union of Operating Engineers, Local 18,*
   137 F.3d 42, (6th Cir. 1998)...............................................................26

*Voda v. New England Tel. and Tel. Co.*, 580 F.Supp. 852, 854
   (D.Mass.1984).....................................................................................18

**<u>Statutes</u>**

Labor Management Relations Act, 29 U.S.C. § 185 ............................................2, 11

**<u>Other Authority</u>**

Elkouri & Elkouri, <u>How Arbitration Works</u>, (7th ed. 2012) ……............................ 19

## JURISDICTIONAL STATEMENT

Appellees Communications Workers of America, District 3 ("CWA") and Communications Workers of America, Local 3702 ("Local 3702") concur with Appellants' Jurisdictional Statement.

## ISSUES PRESENTED

I.      As noted in CWA and Local 3702's Objections and Corrections to Docketing Statement (Appeal Docket Entry No. 9), the District Court did not hold that the filing of a grievance is required to establish a breach of the Union's duty of fair representation, but instead held that Plaintiffs Rebecca Groves ("Groves") and Jonathan Hadden ("Hadden") did not  establish the elements necessary for a hybrid § 301 action against CWA and  Local 3702 because Plaintiffs failed to allege or prove that Defendants breached the duty of fair representation so as to ***prevent*** them from exhausting their claims against their employer, AT&T Mobility, LLC, under the applicable   Collective Bargaining Agreement ("CBA").   Whether the District Court erred in so holding is not matter of first impression before this Circuit.

II.      CWA and Local 3702 deny that a duty of fair representation for which they could be liable was invoked in this case that could be breached, and that any undisputed material facts in this case establish arbitrary or bad faith conduct.

1

## STATEMENT OF THE CASE

Plaintiffs Groves and Hadden brought this "hybrid § 301 action" against Defendants CWA, Local 3702 and their employer, AT&T Mobility, LLC, ("Company" or "Mobility") pursuant to § 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, after Mobility discharged them for poor sales performance. In their Second Amended Complaint, Plaintiffs pleaded that the Company discharged them without just cause in violation of its CBA with CWA, and that CWA and Local 3702 breached the duty of fair representation by failing to inform them "of the Company's error and/or Settlement Agreement," and by refusing to file grievances on their behalf after they learned of the Company's RSSM calculations error.  J.A. 20-24 (Sec. Am. Compl. ¶ 25). Plaintiffs did not plead, nor have they since alleged, that CWA or Local 3702 prevented them from pursuing the contractual remedies against Mobility available to them under the CBA; therefore, their "hybrid § 301 action" cannot stand, and summary judgment in Defendants' favor was prudently granted by the District Court.

CWA is a labor organization which represents employees of Mobility, among others, for purposes of collective bargaining.  CWA Local 3702 is a local union affiliate of CWA located in Anderson, South Carolina.  CWA and the Company have been party to a series of successive collective bargaining agreements establishing terms and conditions of employment for Mobility

2

employees, including those employed by the Company in the Anderson, South Carolina Mobility retail store. J.A. 42-48 (Affidavit of Gerald Souder at ¶¶ 3-4). The CBA contains a grievance and arbitration procedure.[1] J.A. 59-64 (CBA Articles 7-9).

CWA and Local 3702 have separate governing documents in the form of constitutions and by-laws by which they respectively conduct their daily affairs separately and by which they transact business on their own behalf. CWA and Local 3702 operate with separate and non-overlapping hierarchical structures with each electing their own officers and executive board members. J.A. 43-44, 211, 332-336, 347-399 (Souder Aff. ¶¶ 4-7, Souder Dep. 35, Local 3702 By-Laws, CWA Constitution).

Mobility terminated approximately 16 sales employees in the Southeast when poor sales results for April and May 2012 resulted in their discipline for performance being advanced one level. J.A. 44, 110 (Souder Aff. ¶ 8, Frost 8-22-12 Email). Plaintiffs were among the affected employees and were terminated on May 31 and June 2, 2012. At the time of their terminations Groves and Hadden were both on final written warnings for job performance. Neither Groves nor

---

[1] The CBA does not incorporate performance measurement standards for employees; the Memorandum of Understanding cited by Plaintiffs refers only to adjustments to sales quotas (set by the Company) to allow for employee vacation, Company mandated training, Union absence time and discipline and an allowance for internet pricing matches. J.A. 40-41.

3

Hadden filed grievances regarding any discipline received, including termination. J.A. 155-60, 165, 173-75, 177 (Groves Dep. 25, 27-31, Termination Notice, Hadden Dep. 24-5, 28, 31). When a bargaining unit employee at Mobility is terminated, neither CWA nor the local is notified unless the employee files a grievance. In a discipline case, a grievance is not filed unless the affected employee files a statement of occurrence with the local, or requests that one be filed. J.A. 45, 144 (Souder Aff. ¶ 14, Powell Aff. ¶ 7).

Grievances that are not filed within 45 days of discharge are untimely under the CBA, and will not be accepted by the Company as a formal grievance. J.A. 47, 59-60, 144 (Souder Aff. ¶ 21, CBA Article 7, Powell Aff. ¶ 5). This deadline applies to the informal and formal steps as is evident from the plain language of the Sections 1 and 2. Complaints and "prospective grievances" may be addressed with first level Management informally as a first step, but "[a]ny such grievance not addressed or resolved" in the first step must be filed with the Company "within forty five (45) calendar days of the action complained of." J.A. 59 (CBA Article 7).

In July 2012 Mobility determined there were accuracy issues with the sales and performance reports for April and May, and decided to offer reinstatement plus $2500, or $5000 without reinstatement to the affected employees. Mobility contacted CWA via email on August 22, 2012, more than five weeks after

4

Plaintiffs' 45-day grievance deadline, explaining the settlement offer and asking for CWA's assistance in contacting the affected individuals. CWA Representative Gerald Souder emailed and/or telephoned CWA Locals in the affected areas to notify them of the settlement offer and ask that they contact the former employees. Souder emailed Local 3702 President Les Powell regarding Groves and Hadden on August 24, 2012. J.A. 44-45, 238, 249, 280-82 (Souder Aff. ¶ 8, 10, Souder Dep. 79, 98, Souder Notes, Email to Powell).

Souder sent a follow-up email to Powell and five other local presidents who had not responded on September 19. Souder also called Powell's office to follow-up regarding whether the Local had contacted Groves and Hadden. J.A. 45, 214-16, 242, 249-50, 282 (Souder Aff. ¶ 1, Souder Dep. 42-44, 83, 98-9, Souder Email to Powell). Souder e-mailed Powell again on October 26 and 28, 2012 to notify him that Groves and Hadden learned of the Company's settlement offer and to inquire whether the Local wanted to be involved with getting the settlement documents signed. J.A. 45, 136-37 (Souder Aff. ¶ 12, Souder Emails to Powell). Souder has no supervisory authority over Powell or other officers and employees of Local 3702. J.A. 43 (Souder Aff. ¶ 6-7). Powell did not take any action in response to Souder's emails and phone call. Powell testified he thought it was Mobility's responsibility to rehire individuals it fired who were not being

represented by the Local in discharge grievances.    J.A. 144-45, 268, 270 (Powell Aff. ¶ 8; Powell Dep. 29, 31).

Groves learned of the Company's RSSM settlement offer from a manager at the Anderson Mobility retail store on or about October 14, 2012.  The manager had been notified of the settlements in July 2012. On October 24, 2012 Groves contacted the manager and then the Company's Human Resources Department to inquire about the settlement offer.  J.A. 161-162 (Groves Dep. 50-51).  Hadden learned of the RSSM settlement offer from Groves.  Hadden called the Company's Human Resources office and was told to contact Gerald Souder with CWA to sign the offer.  J.A. 179-80 (Hadden Dep. 42-3).

On October 26, 2012 Mobility Labor Relations Manager Frank Garon notified Souder via email that Rebecca Groves had called Company HR to inquire about the RSSM settlement.    The same day Groves e-mailed Souder about the RSSM settlement offer.   Souder provided Groves with a copy of the RSSM Settlement document offering the $5,000 lump sum, but without the reinstatement option, because the Company would not offer reinstatement at that time.  J.A. 46 (Souder Aff. ¶ 16).  Groves e-mailed Souder on October 30, 2012 to find out the deadline to accept the offer.  After checking with Frank Garon, Souder emailed Groves that she would have until the end of the week. On October 31, 2012 Groves emailed Souder for advice about whether to take the $5,000 lump sum.  Souder

responded that it was the only option the Company was offering, and that there was nothing CWA could do contractually because no grievance had been filed. On November 8, 2012 Groves emailed to Souder asking CWA to file a grievance over her termination, which would have been untimely. J.A. 46 (Souder Aff. ¶ 17).

Hadden e-mailed Souder on October 27 and 28, 2012 to inquire about the Company's RSSM settlement offer. Souder forwarded a copy of the Company's $5,000 settlement offer on October 28. On October 29 Hadden responded and asked whether he could fight his termination. Souder again checked with Garon to see whether the Company would offer the reinstatement option given the circumstances, but Garon refused, noting that Hadden could have timely grieved his termination.[2] Souder emailed Hadden and informed him that the grievance deadline had passed and the Company was only offering the $5,000 option. J.A. 46-47, 223, 293-96 (Souder Aff. ¶ 18, Souder Dep. p. 64, Souder Emails with Hadden, Garon).

---

[2] Furthermore, the Company did not demonstrate a "clear willingness to ignore the 45-day deadline" by offering settlement "to all affected employees, whether or not they filed grievances." Docket Entry 16 at 8. By offering settlement well after the 45-day deadline had passed, the Company ensured that its damages would be limited because it could then unilaterally determine the settlement terms, set and change deadlines, and avoid paying the sizeable backpay awards, including the backpay Plaintiffs now seek against the Union, without having to negotiate with the Union or be subject to arbitration. *See* J.A. 60, 129 (Grievance Section 8, Garon Email with Souder).

The original and revised Company deadlines were disclosed by Souder via email and in the Settlement document. J.A. 319, 324-26 (Souder Email to Hadden, Hadden Settlement Agreement). The settlement options and deadlines were established by Mobility alone, and did not involve any input from or negotiation with CWA or Local 3702. J.A. 44, 223-25, 278-79 (Souder Aff. ¶ 9, Souder Dep. 64-6, Steven Frost Email). Furthermore, there is no record evidence to support Groves and Hadden's assertion that "Mobility extended time to accept the offer… to give the Union additional time to contact employees" – the Company has not stated any reasons for establishing and moving the settlement deadlines. Souder could not assure Plaintiffs how long the $5000 pay-out would remain open because it was entirely in the Company's discretion. J.A. 122 (Souder Email to Groves).

In early December 2012, after Groves and Hadden filed this lawsuit, Mobility unilaterally reversed its position and re-opened the $2500 lump sum plus reinstatement settlement offer to affected employees, including Groves, Hadden, and five others who had not yet signed agreements. J.A. 47, 139-41, 304 (Souder Aff. ¶ 20, Frost 12-11-12 Email).

Plaintiffs resolved their disputes with Mobility and agreed to dismiss the Company from this lawsuit. Groves' employment was reinstated by the Employer on March 22, 2013. J.A. 160 (Groves Dep. 31). Hadden's employment was reinstated by the Employer in early March 2013. J.A. 170 (Hadden Dep. 40).

8

Having received their remedy from the Company that fired them, Plaintiffs have since pursued additional damages from the CWA and Local 3702 despite their complete inability to compel Company action due to Plaintiffs' failure to file timely grievances.

Upon completion of discovery, Groves and Hadden filed a partial motion for summary judgment as to liability, and CWA and Local 3702 filed a motion for summary judgment on all Plaintiffs' claims. Docket Entry Nos. 48 and 49. After full briefing and oral argument, the District Court granted CWA and Local 3702's motion in its entirety on August 1, 2014, holding that Plaintiffs "failed to allege or establish that the Defendants breached their duty [of fair representation] so as to prevent Plaintiffs from exhausting their claims under the CBA against AT&T," thereby failing to "establish the elements necessary for a hybrid § 301 action against the Defendant." Docket Entry No. 74.

## SUMMARY OF ARGUMENT

The District Court, following well-established precedent, granted summary judgment in CWA and Local 3702's favor on the basis that Plaintiffs failed to exhaust contractual remedies under the applicable CBA – an essential element of every hybrid § 301 action. By failing to timely grieve their terminations through no fault of Local 3702, CWA or the Company, Plaintiffs foreclosed CWA's ability represent them in challenging their terminations or in seeking a full remedy when

9

the Company admitted possible errors in their performance calculations, as well as their ability to seek a judicial remedy against the Company and union Defendants.

Even if a duty of fair representation arose in these circumstances, the undisputed record on summary judgment demonstrates that neither CWA nor Local 3702 acted arbitrarily or in bad faith. CWA made reasonable, if unsuccessful, steps to contact Plaintiffs regarding the RSSM settlement. Local 3702 took no such steps, but based on the Local President's reasonable belief that the Local should not be involved. CWA and Local 3702 did not act with invidious motive toward Plaintiffs, nor did they act in concert such that the acts or omissions of either Local 3702 or CWA may be attributed to the other.

## ARGUMENT

**I.    Groves and Hadden did not Establish the Required Elements of a Hybrid § 301 Action.**

**A.    The District Court Did Not Create a New Requirement for Hybrid § 301 Claims, but Correctly Applied Well-Established Hybrid § 301 Standards to Facts of this Case.**

In their Second Amended Complaint, Plaintiffs allege that the Company discharged them without just cause in violation of its CBA with the Union, and that CWA and Local 3702 breached its duty of fair representation by failing to inform them "of the Company's error and/or Settlement Agreement" and by refusing to file grievances on their behalf after they learned of the Company's RSSM calculations error. J.A. 4 (Sec. Am. Compl. ¶¶ 19, 21-25). In alleging that the

10

Company breached the CBA when it terminated them and that union failed to represent them, Plaintiffs are expressly asserting a "hybrid" breach of contract/ breach of the duty of fair representation claim under Section 301 of the Labor-Management Relations Act, 29 U.S.C. §185. *Vaca v. Sipes*, 386 U.S. 171 (1967). Plaintiffs concede that in order to prevail in a § 301/fair representation action, they must allege and prove both a breach of the CBA by the Company and the duty of fair representation by the Union. *Reed v. United Trans. Union*, 488 U.S. 319, 328 (1989). "The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both. The suit is thus … a hybrid § 301/fair representation claim, amounting to a direct challenge to the private settlement of disputes under [the collective bargaining agreement]" *DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 165 (1983) (citations and internal quotations omitted).

Hybrid § 301 claims developed as an exception to the longstanding judicial policy requiring that breach of contract claims against an employer are "bound by the terms of that agreement which govern the manner in which contractual rights be enforced. *Vaca*, 386 U.S. at 184. "Thus, if the contract provides for a grievance and arbitration procedure … a court ordinarily may not hear the § 301 suit of an employee who has not resorted to the remedies of his contract." *Id.*; *Hines v. Anchor Motor Freight*, 424 U.S. 554, 562-63, (1976). An employee's

11

failure to exhaust contractual remedies before bringing suit against his employer may be excused when "the conduct of the employer amounts to repudiation of those contractual procedures" or if "the union has sole power under the contract to invoke the higher stages of the grievance procedure … and the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's wrongful refusal to process the grievance." *Vaca*, 386 U.S. at 185.

Here, the alleged Company breach of the CBA is discharge without just cause. To make out a hybrid § 301 claim, Plaintiffs must demonstrate that the union prevented them from challenging their terminations pursuant to the grievance and arbitration procedure of the CBA in breach of its duty of fair representation. The District Court did not create a new standard by requiring that Plaintiffs "allege or establish that the Defendants breached their duty so as to prevent Plaintiffs from exhausting their claims under the CBA against AT&T." Docket Entry No. 74. Rather, "the very purpose of a hybrid § 301 action is to allow an employee to enforce his rights under a CBA when the union has failed to adequately fulfill its duty to the employee." *Id.*, *citing Grant v. United Fed'n of Teachers*, 2014 WL 978444, *9 (E.D.N.Y. 2014); *Doyle v. United Airlines, Inc., 914* F.Supp.2d 325, 338 (E.D.N.Y. Dec. 20, 2012) (a properly pled hybrid § 301 claim must allege employer breach of a CBA and union "breach of its duty of fair representation in redressing her grievance against the employer) (citations

12

omitted). Here, the undisputed material facts establish that Plaintiffs waived their contractual rights by failing to timely grieve their terminations before CWA or Local 3702 had any knowledge of the matter, and the alleged breach of the duty – failure to timely notify them of the full Company settlement offer before the Company removed reinstatement as an option – is unrelated to Plaintiffs' pursuit of remedies available under the CBA.

It is Plaintiffs, not the District Court, who attempt with this appeal to create a new species of hybrid § 301 claims, as the case law they cite does not support their assertion that a plaintiff need not assert that the union wrongfully prevented a plaintiff's exhaustion of contractual remedies. For example, the Sixth Circuit in *Adkins v. Intern'l Union of Elec., Radio & Mach. Workers*, AFL-CIO-CLC, 769 F.2d 330 (6th Cir. 1985), noted that a hybrid § 301 claim against a union may involve allegations other than that a union did not properly pursue grievances, but it upheld the requirement that a plaintiff must exhaust contractual remedies or prove futility. In *Adkins*, plaintiffs alleged that the companies involved breached the applicable CBAs and the unions involved breached their duty of fair representation with regard to a series of agreements reached between the parties. *Id*. at 333-34. However, the court, in determining when plaintiffs' claims accrued for purposes of the applicable six-month statute of limitation, fully recognized and upheld the exhaustion/futility element of the hybrid § 301 action. The Sixth

13

Circuit reasoned that where plaintiffs have pursued their contractual remedies, and the plaintiffs do not allege that the union failed to properly process their grievance (which would trigger accrual of their claim), the six-month limitations period should not run as long as plaintiffs are engaged in a "good faith attempt to exhaust their contractual remedies." *Id.* at 336. The Sixth Circuit does not repudiate, but rather reaffirms, the necessity of plaintiffs' establishing the exhaustion or futility of contractual remedies before pursuing a hybrid § 301 claim in court – "Although, as the jury found, here any attempt to use the grievance procedure in fact was futile, there was no accrual of the claim for the purposes of the limitation period so long as plaintiffs were making a valid, timely, and nonfrivolous attempt to pursue their contractual remedies in reasonable good faith." *Id.* The *Adkins* case has no bearing here, where Plaintiffs neither pursued their contractual remedies in a valid and timely manner, nor did they ever assert or establish that CWA or Mobility's conduct made pursuit of those remedies futile.

Plaintiffs' reliance on *Sparks v. Abe May Packing Co.*, 1989 WL 105939 (6th Cir. 1989) is puzzling. While the plaintiff in *Sparks* alleged a hybrid § 301 claim in connection with the union's "failure to relay to a member the critical term of a proposed settlement agreement," the alleged failure arose in the processing of plaintiff's timely filed grievance. *Id.* at *2. The Sixth Circuit found that "Sparks has stated a "hybrid" claim under § 301 of the LMRA" and described the elements:

14

> "In such a case, the district court must determine whether an employer violated a collective bargaining agreement in cases in which "the **union representing the employee in the grievance/arbitration procedure** acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation." *Id.* (emphasis added) (citations omitted).

Unlike Groves and Hadden, the *Sparks* plaintiff stated a hybrid § 301 claim, but the court remanded to the district court to determine whether the union's conduct in handling his grievance was arbitrary.

*Katsaros v. Transit-Mix Concrete Corp.*, 585 F.Supp. 576 (S.D.N.Y. 1984) is similarly distinguishable. *Katsaros* is another statute of limitations case where the court did not reach the merits of plaintiff's claims. Moreover, the case did not involve a "prior decision concerning other employees," as asserted by Groves and Hadden, but involved the union's arbitration of a contract term with the company that concerned the seniority list for former employees, including plaintiff. *Id*. at 578. Ruling on purely procedural grounds, the *Katsaros* court does not address the elements of a hybrid § 301 claim.

*Fay v. Teamsters Local Union No. 553*, 67 F.Supp.2d 86 (E.D.N.Y.) does not support Plaintiff's cause, either. In fact, the *Fay* court touches on points central to CWA and Local 3702's defense. By introduction the court explains:

> Where, as here, however, the grievance procedures set forth in a collective bargaining agreement provide the exclusive means for resolving labor disputes, **judicial review of an employer's actions is not available unless**

15

> **the employee shows a breakdown in the grievance process itself**.  Accordingly, the second claim in a hybrid cause of action is against the union for breach of its duty of fair representation.  *Id.* at 92 (emphasis added).

Unlike Groves and Hadden, the *Fay* plaintiffs also attempted for file grievances that were presumably timely (there is no discussion in the case indicating they were not), but which the union refused to file based the merits and its interpretation of the CBA.  *Id.* at 97-99.

CWA and Local 3702 never claimed that a hybrid § 301 case cannot involve alleged breaches of the duty of fair representation unrelated to the processing of grievances.  What Defendants argued and the District Court held was that Plaintiffs must take some valid, affirmative step to resolve their complaint with the Company through the contractual processes, or prove futility. The purpose is to protect the integrity of collective bargaining.  Here, Plaintiffs waived their right to that process by failing to timely grieve their terminations.

### C.    Neither CWA nor Local 3702 Prevented Plaintiffs from Timely Pursuing Contractual Remedies Against AT&T Mobility.

The CBA provides that grievances must be filed "within forty-five (45) calendar days of the ***action complained of***."   J.A. 59 (emphasis added).  It is axiomatic in employment cases the clock starts running on the date the adverse employment action occurs. *See English v. Whitfield*, 858 F.2d 957, 961 (4th Cir. 1988) (administrative filing period "begins running on the date that the employee

16

is given definite notice of the challenged employment decision, rather than the time the effects of the decision are ultimately felt). Section 8 of the Grievance Article states clearly and unequivocally: "Failure to submit or pursue a grievance under the conditions and within the time and manner stated above shall be construed to be a waiver by the employee and the Union of the formal grievance." J.A. 60; *see also Miller v. Local 50, American Federation of Grain Millers*, 468 F.Supp. 193 (D. Neb. 1979) ("If no question of fact existed as to the lateness of the filing, the grievance could not be arbitrated."). There is no such question of fact here: Groves and Hadden both admit that they did not grieve their terminations, or any of the progressive discipline leading up to their terminations. J.A. 159-160, 177 (Groves Dep. 30-31, Hadden Dep. 31). The effect of this failure is to foreclose Plaintiffs' pursuit of this action in federal court. *Miller*, 468 F.Supp. at 198 ("The exhaustion of internal union remedies is a prerequisite to a § 301 suit against a union and its officers in federal court…[a]s the plaintiff does not allege that resort to internal union remedies would be futile or inordinately time-consuming, the Court concludes that summary judgment in favor of Local 50 is proper").

Furthermore, there is no allegation or evidence that CWA or Local 3702 prevented Plaintiffs from filing grievances within the contractually-mandated 45 days, much less that they prevented the filing of timely grievances in a discriminatory, arbitrary or bad faith manner. When a bargaining unit employee at

17

AT&T Mobility is terminated, neither CWA nor the applicable local union is notified unless the employee files a grievance. In a discipline case, a grievance is not filed unless the affected employee files a statement of occurrence with the union, or requests that one be filed. J.A. 45, 144 (Souder Aff. ¶ 14, Powell Aff. ¶ 7). CWA and Local 3702 had no knowledge of Plaintiffs' terminations until CWA received Steven Frost's email date August 22, 2012. J.A. 44, 233-234, 270, 278-279 (Souder Aff. ¶ 10, Souder Dep. 74, Powell Dep. 31).

Plaintiffs' requests via email to file grievances, made months after expiration of the grievance deadline, did not amount to a bona fide attempt to exhaust the CBA's remedies. *See Voda v. New England Tel. and Tel. Co.*, 580 F.Supp. 852, 854 (D.Mass.1984). Plaintiffs' failure to file within 45-days of termination is not excused by their asserted lack of understanding as to the grievance procedure. "Employees have a duty to know the grievance procedures provided for in the requisite collective bargaining agreement." *Marcelus v. Corrections Corp. of America/Correctional Treatment Facility*, 540 F.Supp.2d 231, (D.D.C. 2008); *citing Miller v. General Motors Corp.*, 675 F.2d 146, 150 (7th Cir.1982) (declining to excuse failure to exhaust despite claims of lack of knowledge of grievance procedures where plaintiff had access to materials explaining rights and made no allegation that he could not obtain those materials); *Nicolaisen v. Chicago & Northwestern Transp. Co.*, No. 89-2430, 1991 WL 237619, *11 (D.Kan. Oct. 30,

18

1991) (finding that ignorance of contractual rights did not excuse failure to exhaust because employee has duty to know grievance procedures). Groves possessed a copy of the CBA when she was terminated by AT&T Mobility on June 2, 2012, and the Company provides new hires with copies. J.A. 46, 164 (Souder Aff. ¶ 15, Groves Dep. 55).

The fact that Plaintiffs only learned of the alleged flaws in the Company's RSSM data in October 2012 is of no consequence. The filing of a discipline grievance requires the Company to establish just cause for the termination, and it is the Company, not the employee or the union, which has the burden of proof. *See* Elkouri & Elkouri, How Arbitration Works, (7th ed. 2012) ("The burden of proof is generally held to be on the employer to prove guilt of wrongdoing, and probably always so where the agreement requires just cause for discipline"), *StarTran, Inc.*, 2002 WL 35018627, at *6 (September 16, 2002). Where the CBA expressly provides for termination only for just cause, there is no excuse for an employee to wait for evidence disproving just cause to fall in his or her lap. Upon filing a timely grievance, Local 3702 would have been empowered to put the Company to its proof.[3]

_____

[3] Groves and Hadden continue to paint CWA and Local 3702 as devils while improbably lauding the Company's conduct: "When Mobility discovered that the terminations were in violation of the CBA, it took prompt measures to rectify the problem." Appeal Docket Entry 16, at 15. There is no evidence of this. What is known is that the Company claims to have discovered the problem in July, but did

19

Finally, Plaintiffs have not alleged or proven futility to excuse their failure to exhaust. In order to find futility, a "clear and positive showing" that "the Union breached its DFR by refusing to process his grievances" is required. *Noble v. U.S. Postal Service*, 537 F.Supp. 2d 210, 216 (D.D.C. March 24, 2008), citing *Vaca*, 386 U.S. at 186, 87 S.Ct. 903) (exhaustion requirements may be excused where employee-plaintiff "has been prevented from exhausting his contractual remedies by the union's **wrongful** refusal to process the grievance") (emphasis added). Plaintiffs cannot show that CWA's refusal to process their late request for grievances was wrongful. Other employees in Plaintiffs' situation timely grieved their terminations before the Company admitted to the flawed data. J.A. 44 (Souder Aff. at ¶ 9). Also, CWA has long experience administering this CBA with the Company and know from past practice that any attempt to process a grievance filed more than 45 days after the discipline date will be rejected by the Company. J.A. 47 (Souder Aff. ¶ 21). In this instance, Frank Garon referred to and confirmed Hadden's failure to file a grievance in his October 29 correspondence with Gerald Souder. J.A. 129 (Garon Email with Souder). Courts have long afforded unions a considerable amount of discretion in grievance matters. *See, e.g.*, *Ayala v. Union de Tronquistas de Puerto Rico, Local 901*, 74 F.3d 344, 346 (1st Cir. 1996),

---

not notify CWA of the mistake or the offer until August 22, 2012, well after the 45-day grievance deadline had passed for all affected employees in District 3. J.A. 278-280 (Steven Frost Email and Attachment).

> "'In the context of employee grievances, the duty of fair representation is not a straightjacket which forces unions to pursue grievance remedies under the collective bargaining agreement in every case where an employee has a complaint against the company…. A union is accorded considerable discretion in dealing with grievance matters, and it may consider the interests of all its members when deciding whether or not to press the claims of an individual employee.'" (citations omitted).

CWA's failure to file grievances that both it and the Company deemed untimely is not arbitrary behavior "so far outside a "wide range of reasonableness,' as to be irrational." *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 67 (1991) (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953). Moreover, Plaintiffs allege only that the Union refused to process their requests for grievance, "even though such a grievance would be timely." J.A. 23 (Sec. Am. Compl. ¶ 19). The undisputed facts demonstrate otherwise.

## II.    Neither CWA nor Local 3702 Acted in an Arbitrary Manner or in Bad Faith.

### A.    CWA and Local 3702 Are Not Liable for Each Other's Conduct.

Before delving into the question of whether there was a breach of the duty of fair representation, it is crucial to discuss CWA and Local 3702's relationship to one another. Throughout this litigation and now on appeal, Plaintiffs have painted the Local and the District as one monolithic entity – "the Union." They are not one in the same, either in law or in fact. Nor did the representatives of each involved in

21

this case, Local 3702 President Les Powell and CWA Representative Gerald Souder, act in concert or have an agency relationship that would make one entity liable for the conduct of the other.

CWA Local 3702 and CWA District 3, an administrative arm of CWA International Union, are functionally and legally distinct, and the actions of one cannot be imputed upon the other without establishing common law agency. *United Mine Workers v. Coronado Coal Co.*, 259 U.S. 344 (1922) (mere fact of affiliation does not establish an agency relationship); *Carbon Fuel Co. v. United Mine Workers*, 582 F.2d 1346 (4th Cir. 1978), *affirmed* 444 U.S. 212, 217 (1979),

> In the face of Congress' clear statement of the limits of an international union's legal responsibility for the action of one of its local union, it would be anomalous to hold that an international is nonetheless liable for its failure to take certain steps in response to the actions of the local.

*See also Hoyle v. United Auto Workers Local Union 5285, et al.,* 444 F.Supp.2d 467 (W.D.N.C. Aug. 3, 2006) (Local is not agent of International union applying agency principals); *Samosky v. United Parcel Service,* 944 F.Supp.2d 479, 514-15 (S.D.W.Va. May 6, 2013), *citing Shimman v. Frank,* 625 F.2d 80, 97 (6th Cir. 1980) ("The International Union is a separate body from the local. The acts of the local and its agents cannot be automatically imputed to the International.").

Local 3702 and CWA have different organizational structures and separate operations.  CWA is an international labor organization that is legally separate

22

from any of the local unions with which it is affiliated, including CWA Local 3702. J.A. 43 (Souder Aff. ¶ 7). In this case, Souder, a CWA Representative, has no authority over the locals or their elected officers, does not supervise or exercise any control over their work. *Id.* There is no evidence that District 3 or the International Union instigated, supported, ratified or encouraged any act or omission undertaken by Local 3702. Souder asked Powell to do something, and Powell did not do it, but Souder could not direct Powell to take action or discipline him for failure to do so. The CWA Constitution specifically provides that local union officers are overseen by their membership through the democratic process of an election, and that removal of any such officer by the CWA Executive Board may only occur "on clear proof of fraud or dishonesty after sworn charges have been made and after a fair trial and opportunity for appeal." Docket Entry 59-2 (CWA Constitution). Souder, an employee of CWA, is not empowered by the Constitution or any other authority to remove, discipline, or otherwise supervise, dictate or ratify the actions of the Local, nor do Plaintiffs assert facts demonstrating ratification of Powell's conduct. Based on the foregoing, Local 3702's conduct cannot be a subject of Plaintiffs' claim against CWA, or vice-versa.

23

## B.    CWA's Conduct was not Arbitrary in Breach of the Duty of Fair Representation.

Plaintiffs cannot, as a matter of law, establish a breach of the duty of fair representation by CWA. In assessing whether a union breaches its duty of fair representation, a court must find that the union's actions are "arbitrary, discriminatory or in bad faith." *Vaca*, 386 U.S. at 190. Further, "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' . . . as to be irrational." *O'Neill*, 499 U.S. at 67 (citations omitted). The courts have maintained adherence to these principals, noting that the "cases are uniform in holding that neither negligence of the union nor a mistake in judgment is sufficient to support a claim that the Union acted in an arbitrary and perfunctory manner," and that "nothing less than a determination that the union acted with reckless disregard for the employee's rights or was grossly deficient in its conduct will suffice to establish (a breach of the duty claim)." *Harris v. Schwermann Trucking Co.*, 668 F.2d 1204, 1206 (11th Cir. 1982) (citations omitted).

The undisputed record demonstrates that Souder made reasonable efforts to get information regarding the RSSM settlement to affected former employees. He determined the appropriate local union for each of the sixteen individuals identified by the Company and reached out to them on August 24, 2012. J.A. 44-45, 238,

24

249, 280-82 (Souder Aff. ¶ 8, 10, Souder Dep. 79, 98, Souder Notes and Email to Powell). He made notes regarding his efforts and the efforts of Locals that responded. J.A. 113-14. He followed up with the Locals that had not responded in writing on September 18 and 19, 2012. *Id.* He followed up again with Les Powell via email on October 26 and 28 and tried calling him. After being put in contact with Plaintiffs, he responded to their inquiries and checked with the Company regarding their questions. J.A. 45, 214-16, 242, 249-50, 282, 328. Souder did not treat Plaintiffs differently than other affected employees. He did not cause any employees to miss any contractual deadlines as would constitute a failure to perform a ministerial act to preserve a union member's rights. *See Dutrisac v. Caterpillar Tractor Co.*, 749 F.2d 1270, 1274 (9th Cir.1983) (limited holding to "cases in which the individual interest at stake is strong and the union's failure to perform a ministerial act completely extinguishes the employee's right to pursue his claim"). Moreover, none of the cases cited by Plaintiffs to establish arbitrary conduct apply to this situation, where CWA's failure to contact Plaintiffs occurred outside the scope of its role as representative in a grievance, arbitration or other ministerial process established by a CBA.[4]

---

[4] *See Ruzicka v. General Motors Corp.*, 523 F.2d 306, 310 (6th Cir. 1975) (union representative filed a request for arbitration of a discharged employee's grievance two weeks after the thirty-day limit set forth in the collective bargaining agreement); *de Arroyo v. Sindicato de Trabajadores Packinghouse AFL-CIO*, 425 F.2d 281, 283 (1st Cir.1970) (union failure to take grievances through grievance

Even if Souder's reliance on the locals to contact members is construed to be misplaced or even a mistake in judgment, it is not actionable under duty of fair representation jurisprudence. *O'Neill*, 499 U.S. at 67; *Smith v. Local 7898, United Steelworkers of America*, 834 F.2d 93, 96 (4th Cir. 1987) ("a union's exercise of its judgment need not appear as wise in the glaring light of hindsight, and a violation of the duty of fair representation is not made out by proof that the union made a mistake in judgment"); *Thompson v. Aluminum Co. of America*, 276 F.3d 651, 658-59 (4th Cir. 2002); *Griffin v. International Union, United Auto., Aerospace and Agr. Implement Workers of America, UAW*, 469 F.2d 181, 183 (4th Cir. 1972).

### C.  Local 3702's Conduct was not Arbitrary in Breach of the Duty of Fair Representation.

Local 3702 President Les Powell's conduct was not arbitrary in breach of the duty of fair representation.  Powell made a determination that he was not in a position to participate in the RSSM settlement process because Plaintiffs had not filed grievances. J.A. 144-45.  Souder, who requested he contact Plaintiffs, was not in a position of authority over Powell or the Local, so disregarding Souder's request was not a refusal of a work order.  J.A. 43,143.  Under the circumstances -

---

procedure); *Robesky v. Qantas Empire Airways Ltd.*, 573 F.2d 1082 (9th Cir.1978) (union failed to timely appeal termination grievance to arbitration; plaintiff rejected company settlement offer under mistaken impression that arbitration was still an option); *Vencl v. International Union of Operating Engineers, Local 18*, 137 F.3d 420, 420 (6th Cir. 1998) (union failed to request arbitration of grievance in writing within 3 days of company denial as required by the CBA).

26

Plaintiffs had not sought the assistance of the Local, despite being union members and interacting with the Local, had not filed grievances, and the Company had no contact with the Local regarding the settlements - it cannot be said that Powell's response was wholly irrational. Rationality is determined in light of the specific circumstances of the case, and a court must remain highly deferential in its evaluation of whether a union's conduct is arbitrary. *O'Neill*, 499 U.S. at 78. Like Souder, Powell did not treat Plaintiffs differently than other represented employees, did not refuse to file any timely grievances or miss any contractual deadlines. And, like Souder, even if his inaction in response to CWA's emails indicates a mistake in judgment or negligence, it will not support a finding that the Local breached the duty of fair representation.

> ### D. Neither CWA nor Local 3702 Engaged in Bad Faith Conduct.

On appeal as below, Plaintiffs argue the facts rather than arguing the law based on the undisputed material facts. CWA and Local 3207, through their respective representatives Souder and Powell, did not conduct themselves in bad faith. The undisputed record shows that Souder and Powell acted independently, not in concert, and there is no evidence of a bad faith motive. "The burden is on the workers to produce evidence of bad faith." *Simo v. Union of Needletrades, Indus. & Textile Employees*, 322 F.3d 602 (9th Cir. 2003). A finding of bad faith "requires proof that the union acted with 'an improper intent, purpose, or motive;'"

that proof may encompass substantial evidence of fraud, dishonesty, and other intentionally misleading conduct. *Spellacy v. Airline Pilots Association-Int'l*, 156 F.3d 120, 126 (2d Cir. 1998) (citations omitted).

Bad faith analysis looks to the subjective motivation of the union officials. *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1243 (7th Cir. 1997). Plaintiffs can point to no evidence that they were personally disfavored by Souder or Powell, or anyone else at CWA or Local 3702. In an effort to pin a bad motive on Souder, Plaintiffs make conclusory and self-serving accusations that he "lied" to them by, for example, telling Hadden that he had "no case" to fight his termination because he had not filed a timely grievance (true); or complaining to Mobility that they had not provided CWA contact information for affected individuals (true); or Souder discussing the 45-day grievance deadline with Plaintiffs to "push" them to take the offer (the 45-day deadline is true, and one need only read the email to see there is no "pushing" involved). Neither Powell nor Souder fabricated events to shield themselves from accountability and make it more difficult for Plaintiffs to vindicate their rights; nothing Souder or Powell said, did, or failed to do once Plaintiffs contacted CWA affected Plaintiffs' access to a better settlement – what they received was entirely in the hands of the Company.

Souder's account of events has remained consistent. J.A. 45-46, 120-22, 129, 214-15, 245, 257. Souder believes he talked to Powell on the phone and was

28

told that the Local had been unable to reach Plaintiffs. A number of locals had

such difficulty. J.A. 281. Souder also told Powell in his October 26, 2012 email

that he believed Powell told him the Plaintiffs did not file a grievance – a fact

Souder would only know if he learned it from Powell. J.A. 328. Moreover,

Powell did not expressly deny communicating with Souder, but did not recall. J.A.

268-69. Plaintiffs are reading into these immaterial differences in recollection to

create a bogus conspiracy. But even if it were reasonable to infer that Souder

somehow said things to Plaintiffs knowing them not to be true, this is not sufficient

to prove bad faith. Any intentionally misleading conduct must meet a "demanding

standard;" must be so "intentionally misleading' as to be 'invidious.'" *Panrell v.*

*United Mine Workers of America, Intern. Union*, 872 F.Supp. 1502 (N.D.W.Va.

Jan. 20, 1995) (citation omitted). Nothing Souder communicated to Plaintiffs can

be reasonably deemed egregious or invidious.

Likewise, Powell did not act in bad faith by not contacting Plaintiffs. Powell

is not an employee or agent of the CWA in these circumstances. Even assuming,

arguendo, Souder's emails to Powell conferred a duty upon Powell to contact

Plaintiffs when no grievances had been filed, "abrogation" of that duty does show

"clear animus," "deceit and dishonesty" as alleged by Plaintiffs. Animus in the

context of the duty of fair representation refers to ill will or other invidious

considerations, none of which are in evidence in this case. *See Graphic*

29

*Communications Local 4 (San Francisco) (San Francisco Newspaper Printing Co.)*, 249 N.L.R.B. 88 (1980).

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's order granting summary judgment in favor or CWA and Local 3702.

Respectfully submitted,

<u>/s/ Tessa A. Warren</u>
Tessa A. Warren
Quinn, Connor, Weaver, Davies & Rouco, LLP
3516 Covington Highway
Decatur, Georgia 30032
Telephone No. (404) 299-1211
Facsimile  No. (404) 299-1288
E Mail  twarren@qcwdr.com

<u>/s/Nancy Jo Thomason</u>
Nancy Jo Thomason
Post Office Box 4025
303 E. Greenville Street
Anderson, South Carolina 29622
864-226-7222
864-226-7224 (fax)
Email  nancyjo@tandplegal.com

Counsel for Appellees

# ADDENDUM

2014 WL 978444
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
E.D. New York.

Sherry GRANT, Plaintiff,

v.

UNITED FEDERATION OF TEACHERS, United
Cerebral Palsy of New York City, Inc., Defendants.

No. 12−cv−02149 (CBA)(VMS). | Signed
March 11, 2014. | Filed March 12, 2014.

**Attorneys and Law Firms**

Kathy A. Polias, Precious Chinedum Aneji, Brooklyn, NY,
for Plaintiff.

Ariana Antoinette Donnellan, Wendy Michelle Star, NYS
United Teachers Office of Gneral Counsel, Sean H. Close,
Adriana Stefanie Kosovych, Putney, Twombly, Hall &
Hirson LLP, New York, NY, for Defendants.

## MEMORANDUM & ORDER

CAROL BAGLEY AMON, Chief Judge.

**\*1** Plaintiff Sherry Grant brings this action pursuant to
the National Labor Relations Act ("NLRA"), 29 U.S.C.
§§ 151 et seq., the Labor Management Relations Act, 29
U.S.C. §§ 141 et seq., the New York State Human Rights
Law ("NYSHRL"), N.Y. Exec. Law § 296, and the New
York City Human Rights Law ("NYCHRL"), N.Y.C. Admin.
Code § 8–107, against Defendants United Federation of
Teachers ("UFT" or "the union") and United Cerebral Palsy
of New York City, Inc. ("UCP"). Both defendants now
move to dismiss Grant's second amended complaint (or the
"complaint") for failure to state a claim, pursuant to Federal
Rule of Civil Procedure 12(b) (6). The motions are granted in
part and denied in part.

## BACKGROUND

The complaint alleges the following facts. Grant was
employed by UCP as a Residence Program Specialist from
2000 to 2011. (Second Amended Complaint ("SAC") ¶ 8.)

She was also a member of the labor union UFT and the
beneficiary of a collective bargaining agreement between
UCP and UFT that was in effect between December 30, 2009,
and June 29, 2012 (the "CBA").(Id.)

In January 2011, Grant filed an action against UCP in the
Southern District of New York, alleging that, while working
at UCP, she was subject to sex discrimination as well as
retaliation for complaining about sex discrimination and
subsequent retaliation. See Grant v. United Cerebral Palsy of
N.Y.C., Inc., No. 11–cv–0018 (S.D.N.Y.) ("Grant I"). Prior to
bringing that lawsuit, Grant had made complaints about sex
discrimination to managerial staff at UCP, as well as to the
Equal Employment Opportunity Commission and the New
York State Division of Human Rights ("NYSDHR"). (SAC ¶
9.) Grant alleges that, at all relevant times, UFT was aware of
Grant I, as she informed Thara Boucicault, her UFT Chapter
Leader, about the suit. (Id. ¶ 14 .)

In October 2011, Grant was the subject of an allegation that
she was heard saying that a client should burn to death. At that
time, she worked at UCP's Landings site located in Brooklyn.
(Id. ¶ 10.)Grant alleges that UCP required her to stay home for
at least two weeks pending the outcome of an investigation
into the incident, even though two other employees subject
to allegations by the same client were allowed to continue
working during the investigation. (Id.)

In late October or early November, the investigation
determined that the allegations against Grant were
"unfounded." (Id. ¶ 11.)Although Grant was allowed to return
to work, she was transferred to a different site located at
E. 51st Street in Brooklyn. (Id.) At the new site, Grant was
scheduled for ten hours less work than at the Landings site,
and therefore was paid less.(Id.) The other two employees
who were the target of allegations were not transferred and did
not suffer a reduction in hours or wages. (Id.) Grant alleges
that the transfer and reduction in hours violated Article 25(A)
(1), Article 27(D), and Article 28(B) of the CBA. (Id. ¶ 13.)

**\*2** On or about November 3, 2011, Grant requested that
UFT file a grievance on her behalf regarding the transfer.
Although aware that Grant had been transferred in spite
of the allegations against her being deemed unfounded,
UFT "indicated an unwillingness to file a grievance."(Id.
¶ 14.)Grant claims that UFT had filed grievances for
other union members on issues that were "less grave and
serious." (Id.)

On or about November 16, 2011, Grant was called to a meeting, which was attended by Everett Watts, Residential Director of UCP's Landings site, Patricia Traynor, Coordinator of Operations at UCP, Olivia Wint, a UFT employee, and Boucicault, Grant's UFT chapter leader. (*Id.* ¶ 15.)Prior to the meeting, Boucicault had informed Grant that the meeting "was to confirm her schedule at the E. 51st Street site and to give her back the hours she had lost."(*Id.*) However, at the meeting, Grant was informed that UCP wanted to transfer her again. (*Id.* ¶ 16.)According to the complaint, Wint, who was at the meeting because UCP "had asked her to intervene" (*id.* ¶ 15),"took over the 'representation' of Grant, but "overtly sided with and defended UCP"(*id.* ¶ 16). Wint informed Grant that she had to accept one of two transfer options offered by UCP, or else remain at home without pay. (*Id.*) Neither transfer option was acceptable to Grant: One was located in Staten Island, far from Grant's home; the other, although located in Brooklyn, would have required her to work a schedule that would have "inflicted undue hardship on" Grant because she "had a young baby at home and ... the workload [at that location] was exceptionally grueling."(*Id.*) The complaint also faults Wint for not questioning Traynor when she stated that the clients at the E. 51st Street site did not like Grant, and for failing to challenge UCP's claim that it had no other placement options in Brooklyn. (*Id.*)"Instead, Ms. Wint kept angrily repeating that [Grant] had to take one of the ... adverse transfer options or stay home without pay."(*Id.*) During the meeting, however, Boucicault questioned why UCP was attempting to send Grant to another borough, and sent Grant a text message advising her not to take the Brooklyn assignment because of the grueling workload. (*Id.*) Grant alleges that UCP's attempt to transfer her a second time breached the CBA. (*Id.* ¶ 18.)

After the November 16 meeting, Grant repeatedly contacted UFT representative Ilene Weinerman regarding what had occurred. (*Id.* ¶ 19.)Nonetheless, UFT, despite being "aware that UCP was violating the" CBA, indicated "an unwillingness to grieve UCP's adverse transfer" of Grant from the Landings site to the E. 51st Street site, or UCP's efforts to again transfer her during the November 16 meeting. (*Id.*) UFT instead told her that she had no choice but to take one of the newly-offered positions, despite the fact that other positions comparable to Grant's original position at the Landings site were available. (*Id.*) Grant ultimately refused to accept either of the offered positions, and, following the November 16 meeting, remained at home without pay throughout the remainder of the time period relevant to the complaint. (*Id.* ¶ 20.)

**\*3** In mid-December 2011, UFT filed a grievance on behalf of Grant, challenging her initial placement on unpaid leave following the client abuse allegation and her transfer from the Landings site (the "December 2011 grievance").(*Id.* ¶ 20.)In early April 2012, a "Step One" meeting-the first stage of the formal grievance process established by the CBA-was held between Grant, Wint, Boucicault, and representatives of UCP. (*Id.* ¶¶ 20–21.)Grant alleges that at that meeting, UFT did not advocate for her to be reinstated at the Landings site, or otherwise "discuss the substance of the purported grievance."(*Id.* ¶ 21.)Instead, UCP offered Grant a few placement options at other sites, each of which were for fewer hours than she worked at the Landings site. Grant attempted to accept one of the placements; however, in order for her to do so, UFT required her to sign a statement agreeing " 'that she has been fully and fairly represented by the UFT with respect to the negotiation and execution of this Agreement.' " (*Id.*) Grant refused to sign the agreement, and was precluded from returning to work. (*Id.*) Grant does not allege what action was taken with regard to the December 2011 grievance subsequent to the Step One meeting. [1]

Grant commenced this action on May 1, 2012, (Docket Entry ("DE") 1.) As part of discovery in this case before her amended complaints were filed, Grant deposed Alan Seiler, Director of Human Resources at UCP until early 2012. During that deposition, Seiler informed Grant that, although he was responsible for hearing appeals on behalf of UCP during "Step Two" of the grievance process, he never put his reasons for denying grievances in writing, despite the CBA's requirement that any denial be explained in writing. (SAC ¶ 22; UCP–UFT Collective Bargaining Agreement ("CBA"), Art. 29(C) (1).) In her second amended complaint, Grant alleges that UFT never challenged Seiler's failure to put reasons for denials in writing. (SAC ¶ 22.) Although Grant does not allege that this failure affected her December 2011 grievance, she claims that it prejudiced grievances she filed in July 2009 and December 2009, as well as two grievances filed in March 2010 (collectively, the "2009 and 2010 grievances"), by making it impossible for UFT to assess whether to challenge the denials of the grievances through arbitration. (*Id.* ¶ 24.)In each of those instances, Grant's grievances were denied at Step Two, and UFT did not thereafter seek arbitration. (*Id.*)

Based on these allegations, Grant claims that UFT breached its duty of fair representation by (1) refusing to file a grievance on Grant's behalf for a significant period of time

2014 WL 978444

after her transfer from the Landings site, (2) failing to represent her interests at the November 16, 2011 meeting, (3) prosecuting the December 2011 grievance in an untimely manner, (4) failing to represent her interests at the April 2012 Step One meeting, (5) conditioning her return to work on her signing an agreement releasing UFT from any liability related to its representation of her, and (6) failing to require Seiler to put his reasons for denying Grant's 2009 and 2010 grievances in writing. (*Id.* ¶¶ 26–29.)Additionally, Grant claims that UFT's refusal to file a grievance or otherwise effectively represent her constituted retaliation for her lawsuit against UCP in *Grant I,* in violation of the NYSHRL and the NYCHRL. (*Id.* ¶¶ 14, 40–43.)

**\*4** Grant further claims that UCP breached the terms of the CBA by (1) reducing her hours, even though less senior employees' hours were not reduced and there was not a shortage of work, (2) transferring her from the Landings site to the E. 51st Street site arbitrarily, without any disciplinary basis, against her will, ahead of less senior employees, and without informing her of the reason for the transfer, and (3) mandating, at the November 16, 2011 meeting, that Grant accept another transfer to one of two locations, or else stay at home without pay. (*Id.* ¶¶ 30–39.)She also claims that UCP's conduct constituted retaliation for her *Grant I* lawsuit, in violation of the NYSHRL and the NYCHRL. (*Id.* ¶¶ 44–47.)

### STANDARD OF REVIEW

A complaint may be dismissed for "failure to state a claim upon which relief can be granted."*Fed.R.Civ.P. 12(b)(6).* In adjudicating a motion to dismiss pursuant to *Rule 12(b)(6),* a district court accepts the factual allegations in a complaint as true and draws all reasonable inferences from those facts in the plaintiff's favor. *Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir.2011).*"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."*Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)* (internal quotation marks omitted)."A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."*Id.* A complaint need not include "detailed factual allegations," but mere "labels and conclusions" will not suffice. *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).* The "[f]actual allegations must be enough to raise

a right to relief above the speculative level."*Id.*"Determining whether a complaint states a plausible claim" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."*Iqbal, 556 U.S. at 679.*

In resolving a motion to dismiss, "consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."*Allen v. WestPoint–Pepperell, Inc., 945 F.2d 40, 44 (2d Cir.1991).* A court may take judicial notice of the fact of publicly-filed documents; however, it may not take judicial notice of such a document for the truth of the matter asserted in it. *Staehr v. Hartford Fin. Servs. Grp., Inc.,547 F.3d 406, 425 (2d Cir.2008).*

### DISCUSSION

### I. Claim Splitting

Initially, UCP argues that Grant's claims against it should be dismissed because she has impermissibly split between this action and *Grant I* claims arising out of the same facts. Grant's original complaint in *Grant I,* filed January 3, 2011, asserted hostile work environment and retaliation claims under federal and state law against UCP. That complaint described several incidents of harassment and gender bias on the part of UCP supervisors, and alleged that, after Grant complained about that treatment, she was transferred without cause from the location where she had worked for several years to another unit. Additionally, it alleged that after Grant filed a charge with the NYSDHR, she was subjected to unwarranted disciplinary action. In January 2012, Grant moved to amend the complaint in the S.D.N.Y. action, seeking, in part, to add allegations related to the October 2011 client abuse allegation and the subsequent transfer of Grant from the Landings site. (*See* Appendix of Exhibits to UCP's Motion to Dismiss, Ex. E, F.) That motion was granted in November 2012, and Grant filed an amended complaint in the S.D.N.Y. action on December 5, 2012. That amended complaint, however, did not make any allegations with regard to any of the conduct that took place in late 2011. (*See id.*Ex. C.)

**\*5** It is "well-established" that "a plaintiff cannot avoid the effects of res judicata by 'splitting' his claim into various suits, based on different legal theories,"*Waldman v. Vill. of Kiryas Joel, 207 F.3d 105, 110 (2d Cir.2000),* but rather "must bring in one action all legal theories arising out of the same

transaction or series of transactions," *Am. Stock Exch., LLC v. Mopex, Inc.,* 215 F.R.D. 87, 91 (S.D.N.Y.2002)."As part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit." *Curtis v. Citibank, N.A.,* 226 F.3d 133, 138 (2d Cir.2000). If a final judgment in the earlier-filed case would bar litigation of the second case under the doctrine of claim preclusion, or res judicata, the second suit is duplicative and may be dismissed. *See id.* at 138–40 ( " '[T]he true test of the sufficiency of a plea of "other suit pending" in another forum [i]s the legal efficacy of the first suit, when finally disposed of, as "the thing adjudged," regarding the matters at issue in the second suit.' " (quoting *United States v. The Haytian Republic,* 154 U.S. 118, 124, 14 S.Ct. 992, 38 L.Ed. 930 (1894))).

To establish res judicata, "a party must show that (1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. N.Y.C. Dep't of Corr.,* 214 F.3d 275, 285 (2d Cir.2000). Under the third prong of that test, if claims arise subsequent to a prior action, they "need not, and often perhaps could not, have been brought in that prior action; accordingly, they are not barred by res judicata regardless of whether they are premised on facts representing a continuance of the same course of conduct." *Storey v. Cello Holdings, L.L.C.,* 347 F.3d 370, 383 (2d Cir.2003) (internal quotation marks omitted); *see also Lawlor v. Nat'l Screen Serv. Corp.,* 349 U.S. 322, 228 (1955) (A prior judgment "cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case."); *Bank of N.Y. v. First Millennium, Inc.,* 607 F.3d 905, 919 (2d Cir.2010) ("Claim preclusion does not bar claims, even between identical parties, that arise after the commencement of the prior action."); *Legnani v. Alitalia Linee Aeree Italiane, S.p.A.,* 400 F.3d 139, 141 (2d Cir.2005) ("[A]s a matter of logic, when the second action concerns a transaction occurring after the commencement of the prior litigation, claim preclusion generally does not come into play."(internal quotation marks omitted))."Where the facts that have accumulated after the first action are enough on their own to sustain the second action, the new facts clearly constitute a new 'claim,' and the second action is not barred by *res judicata.*" *Storey,* 347 F.3d at 384, "The crucial date" for this analysis "is the date the complaint was filed."*Curtis,* 226 F.3d at 139.

**\*6** Even were *Grant I* to result in a final judgment, Grant's claims against UCP in this case would not be barred by res judicata. The original complaint in *Grant I* was filed in January 2011; the earliest of UCP's actions complained of in this suit occurred in October 2011, when Grant was suspended during the course of the investigation into the client abuse charge. Grant's allegations that UCP breached the CBA and unlawfully retaliated against her by transferring her in autumn 2011 give rise to new claims premised entirely on conduct that took place after the *Grant I* complaint was filed in January 2011. Because res judicata cannot bar claims that arise entirely after the commencement of the first suit, Grant has not improperly split her claims.

UCP argues that Grant's suit is nevertheless barred by the doctrine of claim splitting because, in January 2012, she indicated her intent to amend the *Grant I* complaint to add allegations regarding her October 2011 suspension and transfer from the Landings site. Had Grant in fact filed an amended complaint alleging those facts in January 2012— before the complaint in this case was filed—UCP might have a valid argument. Grant did not, however, amend her complaint at that time and had no obligation to do so, *see Curtis,* 226 F.3d at 139 ("The plaintiff has no continuing obligation to file amendments to the complaint to stay abreast of subsequent events...."). At the time she brought this suit, the operative complaint in *Grant I* had been filed well before the October 2011 conduct complained of in this case; as such, she was entitled to "simply bring a later suit on those later-arising claims,"*id.*

Finally, the Court rejects UCP's assertion that, even though the events in question arose after the filing of the complaint in *Grant I,* the rule against claim splitting applies because the new incidents are "merely ... additional examples of the earlier-complained of conduct" (UCP Mem. at 9). In making this argument, UCP cites *Cameron v. Church,* 253 F.Supp.2d 611, 620 (S.D.N.Y.2003), which held that "[w]here material factual allegations overlap" between an earlier and later case, " 'the facts essential to the barred second suit need not be the same as the facts that were necessary to the first suit [for claim splitting to bar the second suit]. It is instead enough that the facts *essential to the second* were [already] present in the first.' " *Id.* (quoting *Waldman,* 207 F.3d at 110– 11) (emphasis in original) (other internal quotation marks omitted). The *Cameron* court found that a second suit was barred by res judicata because the plaintiff's second complaint alleged nothing more than "different legal theories" and different motivations for the same conduct that had already

been complained of in the first suit, as well as a few new facts postdating the dismissal of the first case. *Id.* at 620–23.Unlike in *Cameron.*Grant, in this case, is not alleging new facts that simply change her legal theory or offering allegations of new conduct that substantially overlaps with the conduct alleged in that earlier case. Rather, Grant's claims here require no reference to or knowledge of the incidents alleged in *Grant I.* but are their own independent legal claims based on entirely distinct facts. In such instances, it was not improper for Grant to bring those claims in a new action. *Compare Waldman,* 207 F.3d at 113 (finding that res judicata applies because "it is simply not plausible to characterize Waldman's claim as one based in any significant way upon" new facts).

## II. The Hybrid § 301/Duty of Fair Representation Claim

### A. General Principles

**\*7** Although an individual employee may bring suit against his employer for breach of a collective bargaining agreement, he first must "attempt to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement."*DelCostello v. Int'l Bhd. of Teamsters,* 462 U.S. 151, 163, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). However, because "this rule works an unacceptable injustice when the union representing the employee in the grievance/arbitration procedure ... breach[es] its duty of fair representation," in such instances "an employee may bring suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding."*Id.* at 164.Such a claim is called a "hybrid § 301/DFR claim," and requires a plaintiff to "prove both (1) that the employer breached a collective bargaining agreement and (2) that the union breached its duty of fair representation vis-a-vis the union members."*White v. White Rose Food,* 237 F.3d 174, 178 (2d Cir.2001) ("*White II*"); *see DelCostello,* 462 U.S. at 164. "[T]he two claims are inextricably interdependent,"*id.*(internal quotation marks omitted); although the plaintiff can chose to sue either the union, the employer, or both, he must, in any event, "allege violations on the part of both,"*White II,* 237 F.3d at 179;*see also DelCostello,* 462 U.S. at 165 ("[T]he case [plaintiff] must prove is the same whether he sues one, the other, or both."). "In order to prevail" on a hybrid suit, "a plaintiff must succeed in both of his claims."*Arteaga v. Bevona,* 21 F.Supp.2d 198, 204 (E.D.N.Y.1998).

In order to establish a breach of a union's duty of fair representation, a plaintiff must establish two elements: (1) "that the union's actions or inactions are either arbitrary,

discriminatory, or in bad faith"; and (2) that there is "a causal connection between the union's wrongful conduct and [plaintiff's] injuries."*Vaughn v. Air Line Pilots Ass'n, Int'l,* 604 F.3d 703, 709 (2d Cir.2010) (internal quotation marks omitted)." '[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness, as to be irrational.' " *White II,* 237 F.3d at 179 (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill.* 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991)) (other internal quotation marks omitted). "This 'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." *Marquez v. Screen Actors Guild, Inc.,* 525 U.S. 33, 45–46, 119 S.Ct. 292, 142 L.Ed.2d 242 (1998); *see also Spellacy v. Airline Pilots Ass'n–Int'l,* 156 F.3d 120, 126 (2d Cir.1998) ("Judicial review of union action ... must be highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibilities." (internal quotation marks omitted)). Arbitrary conduct "is not limited to intentional conduct by union officials but may include acts of omission which, while not calculated to harm union members, may be so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary." *NLRB v. Local 282, Int'l Bhd. of Teamsters,* 740 F.2d 141, 147 (2d Cir.1984) (internal quotation marks omitted). "[M]ere negligence, even in the enforcement of a collective-bargaining agreement" does not establish a breach of the duty of fair representation. *United Steelworkers of Am. v. Rawson,* 495 U.S. 362, 372–73, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990).

**\*8** To establish a duty of fair representation claim based on bad faith, a plaintiff must show that the union acted "with an improper intent, purpose, or motive."*Spellacy,* 156 F.3d at 126;*see also White II,* 237 F.3d at 179 ("A showing of [b]ad faith requires a showing of fraudulent, deceitful, or dishonest action."(internal quotation marks omitted))."A union's acts are discriminatory when 'substantial evidence' indicates that it engaged in discrimination that was 'intentional, severe, and unrelated to legitimate union objectives.' " *Vaughn,* 604 F.3d at 709 (quoting *Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge,* 403 U.S. 274, 301, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971)).

### B. The 2009 and 2010 Grievances

The Court first addresses Grant's claim that UFT breached its duty of fair representation by failing to require Seiler to

2014 WL 978444

put his reasons for denying her 2009 and 2010 grievances in writing at Step Two of the grievance process. [2] Article 29(C)(1) of the CBA requires that the UCP designee at Step Two put his answer to a grievance in writing and "set forth the reason if the grievance is denied."(CBA Art. 29(C)(1).) Grant alleges that UFT's failure to enforce this provision of the CBA harmed her by allowing UCP to act with little accountability, making it "very easy for Mr. Seiler to deny grievances for no legitimate reason," and by inhibiting UFT from being able to fairly and properly evaluate whether to take denied grievances to arbitration. (SAC ¶¶ 23–24.) In its motion to dismiss, UFT argues that this claim is both untimely and fails to state a plausible claim.

A hybrid § 301/DFR claim is subject to a six-month statute of limitations.*DelCostello,* 462 U.S. at 172. This period "begins to run when the employee knew or should have known of the breach of the duty of fair representation,"*White v. White Rose Food, a Div. of DiGiorgio Corp.,* 128 F.3d 110, 114 (2d Cir.1997). UFT argues that because Grant knew by August 2011 at the latest that UFT would not take the denial of her 2009 and 2010 grievances to arbitration, her claim based on those grievances is time-barred.

UFT's timeliness arguments are unpersuasive. Grant does not claim that UFT breached its duty of fair representation by declining to take her claims to arbitration; rather, she faults UFT for failing to require Seiler to put his reasons for denying grievances at Step Two in writing. The relevant question, therefore, is when Grant knew or should have known that UFT was not enforcing the provision requiring the reasons to be put in writing. As the CBA does not require Seiler to provide the grievant with the written response-instead, only the union must be provided with the written reasons (*see* CBA Art. 29(C)(1))—there is no basis for concluding that Grant become aware that no written statement was provided at the time she was informed UFT would not take her claims to arbitration. Rather, the complaint alleges that Grant did not become aware of UFT's alleged failure to enforce that provision until Seiler's deposition in this action on May 30, 2012. (SAC ¶ 22.) Grant first asserted a claim based on that conduct in her July 2012 first amended complaint. (*See* DE 4 ¶ 20.) The claims are therefore timely.

**\*9** Nonetheless, the Court finds that Grant's allegations based on the 2009 and 2010 grievances fail to state a plausible claim for relief. Grant's allegations that UFT's conduct enabled UCP to act with little accountability and inhibited the union from being able to properly evaluate whether to take grievances to arbitration are nothing but conclusory allegations devoid of a factual basis in the record. Grant alleges no facts suggesting that her grievances would have been upheld but for the failure to provide reasons in writing, or that UFT would have decided to take her grievances to arbitration had written reasons for the denial been provided. Furthermore, even if Grant could show that she was harmed by UFT's failure to enforce that particular provision of the CBA, there is no suggestion that the failure was arbitrary, discriminatory, or in bad faith. Grant does not allege that UFT was motivated by an improper purpose toward its members in failing to require written reasons for the denial of grievances, nor does she allege that the requirement was ignored only with regard to her grievances (to the contrary, the complaint alleges that Seiler "*never* put his reasons in writing" (SAC ¶ 22 (emphasis added))). Although a union's conduct in failing to enforce a collective bargaining agreement can be a breach of its obligations under the duty of fair representation, UFT's alleged conduct rises to, at most, mere negligence, as there is no indication that the failure to enforce that particular provision of the CBA had any significant impact on the rights of UFT's members. As such, the Court dismisses Grant's claims against UFT based on the 2009 and 2010 grievances,

## C. The 2011 CBA Breaches and Grievance

The thrust of Grant's complaint is a hybrid § 301/DFR claim brought against both UFT and UCP. Grant claims that UFT violated it duty of fair representation to Grant through its actions in the aftermath of her transfer from the Landings site, and that UCP breached the CBA by transferring her, reducing her work hours, and then attempting to transfer her again. Defendants argue that Grant has failed to state either a duty of fair representation claim or a § 301 claim for breach of the CBA. Additionally, UFT argues that Grant's claims must be dismissed for failure to exhaust administrative remedies.

### 1. *Exhaustion*

UFT argues that, because Grant did not allege that she pursued her December 2011 grievance to Step Two of the grievance process, her claim must be dismissed for failure to fully exhaust the CBA's grievance and arbitration procedures. Although an "employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement" prior to bringing a federal lawsuit, *Vaca v. Sipes,* 386 U.S. 171, 184, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), such exhaustion is not required when the union breached its duty of fair representation with respect to the grievance or arbitration procedure, *see DelCostello,* 462 U.S.

at 163–64. Indeed, the very purpose of the hybrid § 301/ DFR claim is to allow an employee to enforce her rights under a collective bargaining agreement when the union has failed to adequately fulfill its duty to the employee. As Grant alleges both that UCP violated the CBA, and that UFT breached its duty of fair representation with regard to Grant's attempts to pursue a grievance, she was not required to plead exhaustion.[3]

### 2. Breach of the Duty of Fair Representation

**\*10** Grant alleges that, in late 2011 and early 2012, UFT breached its duty of fair representation in five ways: (1) by failing to file a grievance regarding her transfer until over a month after UFT was aware of the issue; (2) by "overtly siding with UCP" and failing to represent Grant's interests at the November 16, 2011 meeting; (3) by failing to act expeditiously in prosecuting the grievance after it was filed; (4) by again siding with UCP and failing to represent her interests at the April 2012 Step One meeting; and (5) by requiring Grant to sign an agreement releasing UFT from liability in order for her to be able to return to work. (SAC ¶ 27.) Assuming the truth of these allegations, this Court concludes that the conduct alleged supports a reasonable inference that UFT acted arbitrarily and in bad faith in its representation of Grant.

Much of UFT's alleged conduct, standing alone, would not establish a breach of the duty of fair representation. For example, the claim that a union "was not aggressive enough, [and] not fast enough" in pursuing a grievance does not necessarily establish a breach of the duty of fair representation. *Mazza v. Dist. Council of N.Y.,* Nos. CV–00– 6854, CV–01–6002, 2007 WL 2668116, at \*12 (E.D .N.Y. Sept. 6, 2007). Without other facts suggesting that the union was deliberately hostile to Grant or was acting with the intent that her claim fail, the fact that UFT delayed in bringing the grievance and was thereafter slow in processing it does not demonstrate the requisite improper motive or lack of rational basis necessary to state a claim for relief.[4] Similarly, although perhaps relevant as evidence of an improper motive on the part of UFT, the Court declines to find, in the absence of authority suggested by any party to the contrary, that a union can breach its duty of fair representation simply by requiring an employee to sign a liability release in conjunction with the resolution of an employee's grievance.

Nonetheless, Grant's allegations regarding UFT's conduct during the meetings held to address her concerns, when considered in conjunction with the other allegations of the complaint, paint a picture of a union doing the bare minimum to vindicate Grant's rights and less than interested in representing her in any meaningful sense, *see Samuels v. Air Transp. Local 504,* 992 F.2d 12, 16 (2d Cir.1993) ("When a union ignores or perfunctorily presses a meritorious claim, it is held to have acted arbitrarily."). Grant clearly and specifically alleges facts demonstrating UFT's hostility toward Grant during the initial November 16 meeting: She alleges that Wint—UFT's primary representative at the meeting—"overtly sided with and defended UCP," by, *inter alia,* "angrily" telling Grant that she had to either accept a second transfer to one of two locations that would have caused Grant hardship "or stay home without pay," failing to "question or challenge" UCP as to why Grant was being transferred again, and failing to ask for support for either UCP's allegations that the consumers at the E. 51st Street site had made complaints about Grant or for UCP's claims that no other transfer sites were available. (SAC ¶ 16.) Similarly, Grant alleges that at the April 2012 Step One meeting, convened as part of the formal grievance process, UFT failed to "discuss the substance of the purported grievance" or "actually prosecute[ ]" the grievance, did not advocate for her reinstatement to her original position at the Landings site, and precluded her from returning to work when she refused to release UFT from liability with regard to its representation of her. (*Id.* ¶ 21.) The facts alleged support Grant's contention that UFT was not, in fact, acting as her representative and trying to resolve her grievance at these meetings, but rather was supporting UCP's continuing attempts to violate the CBA.[5] "[F]acts implying that Union officials were hostile towards [the] plaintiff," *Herr v. Cineplex Odeon Corp.,* No. 92 CIV. 5447, 1994 WL 75008, at \*5 (S.D.N.Y. Mar.4, 1994), or allegations that a union cooperated with an employer in order to disadvantage an employee, *see Wilson v. Am. Postal Workers Union,* No. 11 Civ. 3097, 2012 WL 3822565, at \*4 (S.D.N.Y. Sept.4, 2012) (finding complaint stated a duty of fair representation claim based on union's alleged cooperation with employer to prevent plaintiff's promotion), are sufficient to state a claim that a union breached its duty of fair representation. Considered in light of the additional allegations regarding UFT's short delay in initially filing the grievance and several-month delay before holding the Step One meeting, despite Grant being at home without pay during that time (SAC ¶ 20), the Court has no difficulty in holding that Grant has sufficiently alleged that UFT's actions were arbitrary and in bad faith.

**\*11** Grant's complaint also adequately pleads a causal connection between UFT's alleged arbitrary and bad faith conduct and Grant's injuries. It is certainly plausible that, had UFT's representatives at those meetings more forcefully advocated for Grant's reinstatement to the Landings site, or for her to be transferred to a more suitable alternative site, she would have received some sort of relief for her lost wages and reduction in hours, and she would not have been forced to stay home without pay during the pendency of her grievance. Grant, therefore, has sufficiently stated a breach of the duty of fair representation claim against UFT.

### 3. *Breach of the CBA*

Grant has also adequately alleged that UCP breached the CBA. The complaint alleges that UCP breached the following provisions of the CBA: (1) Article 27(D), which provides that employees shall not be transferred arbitrarily or capriciously, that involuntary transfers shall start with the least senior qualified employee, and that involuntarily-transferred employees shall be informed of the reason for the transfer and provided with advance notice; (2) Article 25(A) (1), which provides that an employee's hours shall not be reduced except for lack of work, in which case hours shall be reduced starting with the least senior employees; and (3) Article 28(B), which gives UCP the right to discharge, suspend, or discipline any employee for just cause. (SAC ¶¶ 30–39.) Grant's factual allegations support each of these alleged breaches. She alleges (1) that she was transferred from the Landings site to the E. 51st Street site without cause and ahead of less senior employees (*id.* ¶ 13), (2) that her hours were reduced due to the transfer, despite the fact that there was no lack of work and that less senior employees did not have their hours reduced (*id.*), and (3) that there was no basis, disciplinary or otherwise, for either the transfer to the E. 51st Street site or for UCP's subsequent attempt to transfer her to another site (*id.* ¶¶ 11–13, 16–18). These allegations are sufficient to state a claim that UCP breached each of the three CBA provisions at issue.

UCP nonetheless argues that, because the charges of client abuse against Grant were determined to be "unfounded," the transfer of Grant from the Landings site was permissible under the terms of the CBA. (UCP Mem. at 16–17.) Appendix B of the CBA provides for three possible resolutions to a charge of client abuse: a finding (1) that the charges are "substantiated," in which case the employee is to be terminated; (2) that the charges are "false," in which case the employee is to be reinstated with back pay; and that the results of an investigation are "inconclusive," in which case

the employee is to be reinstated with back pay, but may, "[i]n some cases ... be transferred to another program."(CBA App. B.) According to UCP, the finding that the allegations against Grant were "unfounded" is equivalent to an "inconclusive" finding, thus allowing UCP to transfer her. (UCP Mem. at 17.)

**\*12** The Court does not read "unfounded" to mean "inconclusive," "Unfounded" means "lacking a sound basis in reason or fact," Webster's Third New International Dictionary 2496 (1969); a definitive word conveying at its essence that the proposition in question is unsupportable. "Inconclusive," by contrast, means "leading to no conclusion or to no definite result," conveying complete uncertainty as to the truthfulness of a proposition, *id.* at 1144.A determination that the allegations against Grant were "unfounded" is thus essentially one that they were false, or at the very least that they far more likely to be false than true. Furthermore, even were this Court to agree with UCP's interpretation of the result of the investigation, a finding of "inconclusive" would only allow for the transfer of Grant, not other adverse action. Such a finding would not justify Grant's resulting loss in hours, or the subsequent attempt to again transfer her, either of which in and of itself would constitute a breach of the CBA.

Having determined that Grant's complaint adequately alleges both a breach of the duty of fair representation on the part of UFT and a breach of the CBA by UCP, the Court denies the defendants' motions to dismiss the hybrid § 301/DFR claims.

### III. State Law Claims

Grant also asserts claims of retaliation under the NYSHRL and NYCHRL against both UFT and UCP. To state a claim of retaliation under either statute, a plaintiff must demonstrate that "(1) she has engaged in protected activity, (2) her employer was aware that she participated in such activity, (3) she suffered an adverse employment action based upon her activity, and (4) there is a causal connection between the protected activity and the adverse action." [6] *Forrest v. Jewish Guild for the Blind,* 3 N.Y.3d 295, 313, 786 N.Y.S.2d 382, 819 N.E.2d 998 (2004).

### A. UFT's Motion to Dismiss the State Law Claims

UFT argues that Grant's state law claims are "subsumed" by the federal statutory duty of fair representation, and they therefore must be dismissed as against UFT. (UFT Mem. at 26–27.) Generally, when a state regulates an activity that is protected by the NLRA or which constitutes an unfair labor practice under the NLRA, "due regard for the federal

enactment requires that state jurisdiction must yield." *San Die go Bldg. Trades Council v. Garmon,* 359 U.S. 236, 244, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). Although the Second Circuit has not addressed the issue, district courts in this Circuit have regularly held that "[s]tate law claims alleging conduct that is within the union's duty of fair representation are subsumed by this duty and are therefore preempted." *Zuckerman v. Volume Servs. Am., Inc.,* 304 F.Supp.2d 365, 373 (E.D.N.Y.2004)."Put differently, where a state law claim gives no new rights to the employee and imposes no new duty on the union, it is preempted." *Id.*

In this case, Grant alleges that UFT violated the NYSHRL and NYCHRL by refusing to diligently pursue her grievance and by supporting UCP's actions against her in retaliation for her filing of the *Grant I* discrimination lawsuit against UCP. Such conduct, however, would also constitute a violation of UFT's duty of fair representation towards Grant, as that duty "unquestionably forbids a union from discriminating against its members in its representative capacity," *Rodolico v. Unisys Corp.,* 96 F.Supp.2d 184, 188 (E.D.N.Y.2000). Because Grant's claim seeks to vindicate the same rights as those protected by the duty of fair representation, her NYSHRL and NYCHRL claims are preempted. *Accord Holcombe v. U.S. Airways Grp., Inc.,* Nos. 03–cv–4785, 08–cv–1593, 2013 WL 5525686, at \*9 (E.D.N.Y. Sept.30, 2013); *Angrisani v. Long Island R.R.,* No. CV–01–8453, 2005 WL 1311798, at \*6–\*7 (E.D.N.Y. June 1, 2005); *Zuckerman.* 304 F.Supp.2d at 373; *Rodolico,* 96 F.Supp.2d at 187–89; *Fenn v. Verizon Commc'ns, Inc.,* No. 08 Civ. 2348, 2010 WL 908918, at \*6 (S.D.N.Y. Mar. 15, 2010); *Cabrera v. NYC,* 436 F.Supp.2d 635, 646 (S.D.N.Y.2006); *Marrero v. City of NY,* No. 02 Civ. 6634, 2003 WL 1621921, at \*3 (S.D.N.Y. Mar.28, 2003); *Agosto v. Corr. Officers Benevolent Ass'n,* 107 F.Supp.2d 294, 310–11 (S.D.N.Y.2000); *Snay v. U.S. Postal Serv.,* 31 F.Supp.2d 92, 99–100 (N.D.N.Y.1998). Accordingly, Grant's state law claims against UFT must be dismissed.

**B. UCP's Motion to Dismiss the State Law Claims**

**\*13** UCP argues that Grant's NYSHRL and NYCHRL claims against it should be dismissed because Grant has failed to allege facts supporting a claim of retaliation under those statutes; namely, because the facts of Grant's complaint fail to give rise to an inference of a causal connection between Grant's January 2011 filing of the complaint in *Grant I* and her suspension and transfer in October 2011. UCP argues that because Grant's protected activity occurred nine months prior to those adverse actions, she has failed to demonstrate any causal connection.

For purposes of a retaliation claim under either the NYSHRL or NYCHRL, [7] a causal connection "can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. NYC. Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir.2000). In this case, because Grant alleges no direct evidence of retaliatory animus on the part of UCP, she relies solely on indirect evidence: the alleged temporal proximity between her protected conduct and the adverse actions, and the disparate treatment between herself and the two other employees against whom client abuse allegations were made.

The Court concludes that Grant's allegations sufficiently raise the inference of a causal connection between the filing of Grant's complaint and the adverse actions such that her NYSHRL and NYCHRL claims can survive a motion to dismiss. Although the nine-month gap between the filing of Grant's lawsuit and the alleged retaliatory conduct might be insufficient, on its own, to state a retaliation claim, *see Ghaly v. U.S. Dep't of Agric.,* 739 F.Supp.2d 185, 200 (E.D.N.Y.2010) (noting that three months is "the outer edge" for an inference of causation (internal quotation marks omitted)), the totality of the circumstances alleged are sufficient to raise an inference of a causal connection. Critically, Grant does not rely solely on temporal proximity to establish a causal connection; she also alleges facts suggesting that she was treated differently than similarly situated employees. She alleges that of the three employees subject to the October 2011 client abuse allegations, only she was suspended pending the outcome of the investigation, and only she was ultimately transferred to a new location and forced to sustain a reduction in hours and wages. (SAC ¶¶ 10–11.) Because "one way to establish a claim of retaliation is to show that the complaining employee is treated differently than other employees who did not engage in a protected activity," *Conklin v. County of Suffolk,* 859 F.Supp.2d 415, 433 (E.D.N.Y.2012), such allegations raise the inference of a causal connection between the protected activity and the adverse action. Those allegations, particularly when considered alongside allegations that Grant had been actively prosecuting her *Grant I* lawsuit very shortly prior to her suspension and transfer (*see* SAC ¶ 12 (alleging Grant's suspension was less than a month following the initial conference in *Grant I* )), render her retaliation claims against

UCP sufficient to survive a motion to dismiss, *cf. Infantolino v. Joint Indus. Bd. of Elec. Indus.,* 582 F.Supp.2d 351, 359 (E.D.N.Y.2008)* (noting that, under the ADA, protected activity includes not only the filing but also the prosecution of a retaliation lawsuit).

## CONCLUSION

**\*14** For the reasons above, the Court grants the defendants' motions to dismiss to the extent of dismissing (1) Grant's claim that UFT breached its duty of fair representation with regard to the 2009 and 2010 grievances, and (2) Grant's claims against UFT brought under the NYSHRL and NYCHRL. The motions to dismiss are denied with respect to Grant's hybrid § 301/DFR claims against both UFT and UCP based on her transfer from the Landings site and the related conduct that occurred in late 2011 and early 2012, and with respect to her NYSHRL and NYCHRL claims against UCP.

SO ORDERED.

### Footnotes

1    A letter from UFT to Grant, filed as an exhibit attached to Grant's response to UFT's motion to dismiss, indicates that Grant's "Step Two grievance" was deemed "abandoned" by the union. (Affirmation of Kathy A. Polias, Ex. 2 (Docket Entry 33–2).) Because the complaint does not rely on that letter and as it is not otherwise integral to the complaint, the Court cannot consider it while evaluating a motion to dismiss pursuant to Rule 12(b)(6).*See Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991) (in evaluating motion to dismiss, court may only consider facts in complaint, documents incorporated by reference into complaint, or matter which the court may take judicial notice of).

2    Grant does not assert any claim against UCP related to the denial of the 2009 and 2010 grievances.

3    To the extent that UFT argues that Grant was required to at least "attempt" to use the CBA's grievance procedures, the Court concludes that she has adequately plead facts suggesting such an attempt. The complaint clearly alleges that Grant asked UFT to initiate grievance proceedings on her behalf (which the union eventually did). Although, as UFT argues, she does not allege that she then sought review of the Step One denial of her grievance through a Step Two proceeding, she was not required to do: Under the terms of the CBA, only UFT could appeal to a Step Two proceeding. (*See* CBA Art. 29(C)(1) ("If the grievance is not resolved at Step One, the Union may appeal in writing....").) As such, Grant's initial request that UFT pursue a grievance was a sufficient "attempt to use the official procedures" under the CBA, *Clarke v. Commc'ns Workers of Am.,* 318 F.Supp.2d 48, 55 (E.D.N.Y.2004) (internal quotation marks omitted).

4    The Court also notes that, as Grant does not argue the delay in filing the grievance caused it to be waived, there is no indication that she was prejudiced by that delay, *see Smith v. Drug. Chem., Cosmetics, Plastics & Affiliated Indus. Warehouse Emps. Local 815,* 943 F.Supp. 224, 239 (E.D.N.Y.1996) (finding union's delay in filing grievance was not a breach of its duty of fair representation in part because the employer never argued that the delay had waived the right to grieve the termination).

5    Grant's allegations regarding Boucicault's involvement at the November 16 meeting do not, as UFT argues, undermine this conclusion. Although Boucicault's actions may add some merit to UFT's factual argument that Grant was well-represented at the meeting, the complaint clearly alleges that it was Wint who "took over" Grant's representation at the meeting. (SAC ¶ 16.) The allegation that Boucicault asked a single question during the meeting does not suffice to contradict the allegations supporting this characterization. As such, Grant's allegations regarding Wint's conduct are certainly sufficient to suggest that UFT failed to adequately represent her at that meeting.

6    The Court is mindful that the class of retaliatory actions cognizable under the NYCHRL is broader than the adverse actions cognizable under the NYSHRL and Title VII. *Williams v. N.Y.C. Hous. Auth.,* 61 A.D.3d 62, 66–71, 872 N.Y.S.2d 27 (N.Y. 1st Dep't 2009). Whether Grant suffered an adverse employment action, however, is not contested.

7    The standards for demonstrating causation under either the NYSHRL or NYCHRL are the same as under Title VII. *See Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002).

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

884 F.2d 1393
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table
of Decisions Without Reported Opinions"
appearing in the Federal Reporter. Use FI
CTA6 Rule 28 and FI CTA6 IOP 206 for rules
regarding the citation of unpublished opinions.)
United States Court of Appeals, Sixth Circuit.

Douglas SPARKS, Plaintiff-Appellant,

v.

ABE MAY PACKING COMPANY;
United Food and Commercial Workers
District Union 427, Defendant-Appellee.

No. 88-4002.    |    Sept. 14, **1989**.

N.D.Ohio

REVERSED AND REMANDED.

On Appeal from the United States District Court for the
Northern District of Ohio.

Before KENNEDY, NATHANIEL R. JONES and
WELLFORD, Circuit Judges.

**Opinion**

PER CURIAM.

 **\*1** Douglas Sparks filed a complaint against his former
employer, Abe May Packing Company (the company), and
his union, United Food and Commercial Workers District
Union 427 (the union). The complaint was brought under
the Labor Management Relations Act (LMRA), specifically
§ 301 of the Act, 29 U.S.C. § 185. He charged the company,
at least inferentially, with violation of his rights under the
collective bargaining agreement (CBA) in effect at the small
meat packing plant involved in this controversy. He asserted
that after nine years of employment, he was injured at work
and that when he returned "ready and able to resume his
former job duties" some two months later, he was offered
"less important positions" at a rate of pay significantly lower
"than what his old job paid." He charged that the defendant
union "failed to pursue the grievance" which he filed against
the company for alleged violation of the CBA.

The CBA effective at the time this dispute arose contained
an exclusive grievance procedure which required negotiation
of grievances between the union and Abe May. If there were
no resolution, the union had the discretion to submit the
grievance to binding arbitration.

In 1986, the district court granted the company's motion for
summary judgment. The district court granted the motion
because: (1) plaintiff failed to respond to it; (2) no facts
were presented to show that the union acted "arbitrarily,
discriminatorily, or in bad faith;" and (3) no facts established
that the company did, in fact, breach the CBA. Sparks took
no appeal from the judgment for the company.

The union then filed its motion for summary judgment.
The only fact in substantial dispute was whether the union
representative relayed to Sparks the salary terms of the
company's final offer of reinstatement which was equivalent
to his former position and rate of pay. Assuming that the
union did not relay this information, the court, nevertheless,
granted the union's summary judgment motion holding that
the facts, as alleged by appellant, were inadequate to show
that the union breached its duty of fair representation under
§ 301.

Sparks has stated a "hybrid" claim under § 301 of the LMRA.
In such a case, the district court must determine whether
an employer violated a collective bargaining agreement in
cases in which "the union representing the employee in the
grievance/arbitration procedure acts in such a discriminatory,
dishonest, arbitrary, or perfunctory fashion as to breach its
duty of fair representation." *DelCostello v. Teamsters,* 462
U.S. 151, 164 (1982). Under such a theory, the employee
may state its claim against either the union, the employer or
both. Sparks must show that the union's conduct was arbitrary,
perfunctory, discriminatory or in bad faith, and/or that the
union's conduct seriously undermined the arbitral process.
*Barr v. United States Parcel Service,* 868 F.2d 36, 43 (2d
Cir.**1989**) (quoting *Vaca v. Sipes,* 386 U.S. 171, 190 (1967);
*Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 567
(1967)).

 **\*2** The union set out in its brief for summary judgment,
following the entry of judgment for the company, that Sparks'
grievance was processed and an informal meeting held with
the company at which an offer of "work in another capacity"
was refused. It set out that a further meeting was held and
"Sparks was again offered a job other than his prior job," and
again Sparks refused. The union maintained that, "at this same

time the offer was made to return Plaintiff to his previous position," and Sparks again assertedly declined. Roy Archer, the union representative, testified in his deposition "I told him [Sparks] that the Company had offered his original position and old pay and the job back. My advise [sic] was to return to work immediately.... He refused to go back to work." Archer amplified that Sparks apparently thought the final offer was $6 an hour, a rate much less than his former rate, and that Sparks apparently either did not believe him or would not listen to his advice about "old pay" and "the job back."

Sparks stated in a responsive affidavit that he refused to go back because "Archer informed him that Abe May Packing Company would reinstate him to his former position but at a lower rate of pay." In his deposition, Sparks said he could not remember exactly what rate of pay was finally offered but that Archer told him it was $6 an hour. [1] There was, then, clearly a factual dispute as to whether Archer advised Sparks that he was offered full reinstatement or not. In order that summary judgment be appropriate, there must be no "genuine issue as to any material fact." Federal Rule of Civil Procedure 56(c).

The district court granted the union's motion for summary judgment holding:

The Court agrees with defendant Union that plaintiff has not shown that the Union acted in a discriminatory or arbitrary manner or in bad faith. The evidence showed that the Union attempted to obtain plaintiff's reinstatement. In fact, plaintiff was offered his old job back three times. At two least of those offers were at a lower rate of pay but even if the third offer was at the old pay rate, without plaintiff's knowledge, it does not prove breach of duty of fair representation. The Union terminated the pursuit of the grievance only after plaintiff refused several settlement offers. Even Mr. Archer's statement to plaintiff that he believed the grievance was ludicrous and a waste of time does not show bad faith. A good faith decision that a grievance lacks merit does not constitute a breach of duty of fair representation because a Union must be allowed to exercise reasonable discretion in representing its members.

The district court correctly cited *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151 (1982), *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554 (1976), and *Vaca v. Sipes,* 386 U.S. 171 (1967), for the proposition that the union may be liable for failure to its duty of fair representation when it "in the dispute process acts in a discriminatory, dishonest, arbitrary or perfunctory manner." It noted further, however,

citing only a district court case, that "negligence or mistaken judgment is insufficient to amount to a breach of the union's duty."

**\*3** We have held, however, in wrestling with what constitutes "arbitrary" or "perfunctory" conduct on the part of a union:

that, absent justification or excuse, a union's negligent failure to take a basic and required step, unrelated to the merits of the grievance, is a clear example of arbitrary and perfunctory conduct which amounts to unfair representation. [*Ruzicka v. General Motors Corporation,* 523 F.2d 306, 310 (6th Cir.1975) (*Ruzicka I* ).... In our order denying the petition for rehearing, we observed that "[o]ur opinion in this action speaks to a narrow range of cases in which unexplained union inaction, amounting to arbitrary treatment, has barred an employee from access to an established union-management apparatus for resolving grievances." 528 F.2d at 913. The key to *Ruzicka I,* then, was our holding that "unexplained union inaction" which substantially prejudices a member's grievance could amount to the type of arbitrary conduct which evidences unfair representation.

*Ruzicka v. General Motors Corp.,* 649 F.2d 1207, 1211 (6th Cir.1981).

At the same time in *Ruzicka II,* above cited, we reiterated that "ordinary negligence, without more, cannot establish a breach of the duty of fair representation," citing many cases from other circuits. *Ruzicka II,* 649 F.2d at 1212. We put it somewhat differently that "arbitrary perfunctory union conduct which exhibits something *more than simple negligence* is a breach of duty of fair representation." *Farmer v. ARA Services, Inc.,* 660 F.2d 1096, 1103 (6th Cir.1981) (emphasis added). Again, it was stated in *NLRB v. International Brotherhood of Teamsters,* 782 F.2d 46 (6th Cir.1986), that "the union must avoid arbitrary conduct." *Id.* at 51 (citing *Ruzicka I,* 523 F.2d at 310) (citing *Vaca v. Sipes,* 386 U.S. at 177)).

The central issue in this case, as we view it, is whether a fair representation claim can be based on the union representative's failure to relay to a member the critical term of a proposed settlement. Having found that there was no evidence of bad faith, the district court was required to determine whether the union's conduct was arbitrary. The district court made no determination that this action, if

proven, constituted "arbitrary" conduct on the part of the union.[2]

An act or failure to act on the part of the union may be egregious (more than just negligent) so as to constitute arbitrary conduct for failure to transmit vital information to the grievant. The breach of duty of fair representation in this context has been held to be an unfair labor practice under the National Labor Relations Act. *NLRB v. Local 282, Teamsters,* 740 F.2d 141 (2d Cir.1984). "The union has a

duty to inform its membership of management's position...." *Warehouse Union Local 860 v. NLRB,* 652 F.2d 1022, 1025 (D.C.Cir.1981).

Accordingly, we must REVERSE and REMAND this matter for further proceedings consistent with this opinion.

**Parallel Citations**

1989 WL 105939 (C.A.6 (Ohio))

Footnotes

1    Sparks claimed to have been making $8.31 an hour before he ceased work by reason of injury.

2    A breach of duty of fair representation claim can be made, alternatively, if the union is shown to have acted with "hostility," or "discrimination," or "in bad faith," or dishonesty. *See NLRB v. Teamsters,* 782 F.2d at 50, 51.

---

**End of Document**                                  © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Appeal: 14-1854    Doc: 21    Filed: 01/26/2015    Pg: 56 of 74

Nicolaisen v. Chicago and Northwestern Transp. Co., Not Reported in F.Supp. (1991)

1991 WL 237619, 138 L.R.R.M. (BNA) 2863, 57 Fair Empl.Prac.Cas. (BNA) 468

1991 WL 237619
United States District Court, D. Kansas.

Anna M. NICOLAISEN, Plaintiff,

v.

CHICAGO AND NORTHWESTERN
TRANSPORTATION COMPANY,
and Transportation Communications
International Union, Defendants.

Civ. A. No. 89–2430–V.    |    Oct. 30, 1991.

**Attorneys and Law Firms**

Bert S. Braud, Dennis E. Egan, The Popham Law Firm, Kansas City, Mo., for Anna M. Nocolaisen.

Kent A. Coxe, Thomas R. Rehorn, Jeffrey S. Bay, Van Osdol, Magruder, Erickson & Redmond, Kansas City, Mo., for Chicago and Northwestern Transportation Company.

Kathleen A. McNamara, Steven A. Fehr, Jolley, Walsh & Hager, P.C., Kansas City, Mo., James M. Darby, Transportation Communications International Union, Rockville, Md., Joseph Guerrieri, Jr., John Edmond, Nancy E. Segal, Guerrieri, Edmond & James, P.C., Washington, D.C., for Transportation Communications International Union.

*MEMORANDUM AND ORDER*

VAN BEBBER, District Judge.

**\*1**  This case is now before the court on the following:

Defendant Chicago and Northwestern Transportation Company's Motion to Dismiss, or Alternatively, for Summary Judgment (Doc. 79); and

Defendant Transportation Communications International Union's Motion for Summary Judgment (Doc. 75).

This case is a breach of collective bargaining agreement/duty of fair representation action brought by plaintiff, Anna M. Nicolaisen, against her former employer, Chicago and Northwestern Transportation Company ("C & NW"), and her former union, Transportation Communications International Union, AFL–CIO ("TCU"). Plaintiff also alleges that both C & NW and TCU violated the Age Discrimination

in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–634.[1] For the reasons set forth below, defendant TCU's motion for summary judgment (Doc. 75) is granted, and defendant C & NW's motion for summary judgment (Doc. 79) is granted in part and denied in part.

### *I. SUMMARY JUDGMENT STANDARDS*

In considering a motion for summary judgment, the court must examine any evidence tending to show triable issues in the light most favorable to the nonmoving party. *Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir.1984), *cert. denied,* 469 U.S. 1214 (1985). A moving party is entitled to summary judgment only when the evidence indicates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine factual issue is one that "can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be discharged by "showing," that is, pointing out to the district court, that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party, who "may not rest on mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256. Thus, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.*

### *II. FACTUAL BACKGROUND*

The pertinent uncontroverted facts established by the parties in accordance with D.Kan.Rule 206(c) appear as follows. Defendant C & NW is a "carrier" as defined by section 1 of the Railway Labor Act ("RLA"), 45 U.S.C. § 151. Defendant TCU is a "representative" as defined by section 1 Sixth of the RLA, 45 U.S.C. § 151 Sixth, and serves as the collective bargaining representative for all individuals employed by C & NW in the clerical craft and class.

Appeal: 14-1854    Doc: 21    Filed: 01/26/2015    Pg: 57 of 74

Nicolaisen v. Chicago and Northwestern Transp. Co., Not Reported in F.Supp. (1991)

1991 WL 237619, 138 L.R.R.M. (BNA) 2863, 57 Fair Empl.Prac.Cas. (BNA) 468

**\*2** Plaintiff was born on March 20, 1927. Plaintiff was employed by defendant C & NW from approximately September, 1955, until May 19, 1989, and was a member of TCU for approximately 34 years. Plaintiff's last employment with C & NW was in the Overland Park, Kansas, office as Chief Service Clerk, Sales and Marketing Department. As a clerical employee of C & NW, plaintiff was covered by certain collective bargaining agreements between C & NW and TCU, [2] including Agreement F, Appendix D which, in the event of job abolishment, provides various benefits to "protected" employees who meet the requirements of the "Protective Agreement." As chief services clerk, plaintiff held an appointed position and was classified as a "1–J partially exempt" employee. The sick leave benefits and vacation time of a "1–J partially exempt" employee are exempt from the rules of the collective bargaining agreement and are covered by C & NW company policies. Plaintiff's position was also part of a nationwide seniority roster, Seniority District No. 14.

From September 6, 1988, to March 5, 1989, plaintiff took a medical leave of absence for treatment of breast cancer. On September 14, 1988, while plaintiff was on sick leave, she received notice from C & NW that, effective September 30, 1988, plaintiff's position would be abolished as part of C & NW's reorganization of its Sales and Marketing Department. As part of the reorganization, C & NW's Kansas City Area office was closed and bulletins were posted advertising new clerical positions in Seniority District No. 14 at Omaha, Nebraska; Somerset, New Jersey; Minneapolis, Minnesota; and Portland, Oregon. On or around September 14, 1988, plaintiff telephoned TCU General Chairman William J. Van Kleek [3] who informed her that she could not exercise her seniority rights to displace or to "bump" any junior employees in other clerical jobs until she was released by her doctors and her leave of absence had terminated.

By application dated March 16, 1989, plaintiff requested and C & NW approved an extension of her medical leave from March 6, 1989, to May 5, 1989. In mid-March, 1989, plaintiff telephoned TCU General Chairman Ernest L. Heifner to request information about "bumping" or displacing into a clerical position in Minneapolis, Minnesota, upon returning from sick leave. Mr. Heifner advised plaintiff to contact C & NW for this information. Plaintiff also inquired as to whether she was entitled to separation pay under the Protective Agreement. Mr. Heifner informed her that under the terms of the agreement, she would not be eligible for severance pay as long as there were still vacant positions in

her seniority district. Plaintiff then telephoned Terrance L. Amburn, C & NW Manager of Sales and Marketing, who told plaintiff that J.P. Toren, C & NW Vice–President of Sales and Marketing, or Gary Kolbe would have to handle plaintiff's job displacement.

On March 31, 1989, plaintiff wrote a letter to Mr. Toren advising him that she would be released by her doctors to return to work on April 3, 1989, and that she intended to exercise her seniority rights to displace into the newly created clerk's position in Minneapolis. She also requested more information about the Minneapolis position. Warren Bruce, Vice–President of Sales and Marketing, then notified plaintiff by letter, dated April 3, 1989, that before she could return to work, she would first need to have her medical records reviewed by C & NW's medical director, Dr. Cook. The letter also listed three clerical positions for which plaintiff had the option to exercise seniority: Omaha, Nebraska; Minneapolis, Minnesota; and Somerset, New Jersey.

**\*3** Plaintiff then contacted Dr. Cook and was told that she would also need to be examined by a company doctor before she could return to work. Plaintiff was examined on April 18, 1989. Plaintiff was released to return to work by the C & NW Medical Department on April 24, 1989.

By letter dated April 20, 1989, defendant C & NW advised plaintiff that she had allegedly been overpaid sick leave benefits for 1988, in the amount of $3,414.14. The letter informed her that when she returned to work, the overpayment would be deducted from any future paychecks issued to her. The letter also stated that since her March 31, 1989, letter advising C & NW of her intent to bump into the Minneapolis position was submitted prior to her medical release, she would need to advise C & NW again of her intentions after she was released by Dr. Cook.

On April 25, 1989, plaintiff wrote a letter to C & NW reiterating her intent to take the Minneapolis position and asking various questions about the position. On that same date, Mr. Amburn had called plaintiff and told her that she had been released by C & NW's Medical Department, that she needed to advise C & NW of her intentions, and that a letter concerning the overpayment of sick benefits had been sent by certified mail. Plaintiff stated that she wished to bump into the Minneapolis position and that she had not yet received the April 20, 1989, letter. Later that same day, plaintiff called Mr. Amburn back and advised him that she wanted to review the April 20, 1989, letter before making

Appeal: 14-1854    Doc: 21    Filed: 01/26/2015    Pg: 58 of 74

Nicolaisen v. Chicago and Northwestern Transp. Co., Not Reported in F.Supp. (1991)

1991 WL 237619, 138 L.R.R.M. (BNA) 2863, 57 Fair Empl.Prac.Cas. (BNA) 468

a final decision regarding employment and that she would call Mr. Amburn back concerning her intentions and also follow up by letter. The court finds that plaintiff's unsupported statements in her memorandum in opposition that she does not recall these conversations and/or that she "recalls the conversation differently" is not sufficient under the *Celotex* and *Anderson v. Liberty Lobby* line of cases to controvert Mr. Amburn's affidavit concerning the existence and specifics of the April 25, 1989, conversations.

After receiving C & NW's letter of April 20, 1989, plaintiff called General Chairman Heifner to inquire about C & NW's right to demand a recoupment of the overpayment. Mr. Heifner advised plaintiff that, based on an agreement negotiated by TCU and C & NW, Special Agreement No. 50, C & NW waived its right to recoup any overpayments made to employees unless such recoupment took place within sixty days after the overpayment. Mr. Heifner told plaintiff that he would contact C & NW to discuss the matter. Mr. Heifner then telephoned C & NW Vice–President of Labor Relations, John Raaz, and informed him that in light of Special Agreement No. 50, C & NW could not withhold any of plaintiff's future salary to recoup the alleged overpayment and that TCU would file a grievance if the company tried to recover the alleged overpayment. Mr. Heifner took no specific action at that time since, based on his interpretation and application of Special Agreement No. 50, the agreement was not violated and no grievance could be filed until the carrier actually deducted the overpayment.

**\*4** On April 27, 1989, plaintiff telephoned Mr. Heifner requesting advice as to what steps she should take in order to protect her seniority since her medical leave was due to expire on May 5, 1989. She stated that she had not yet received information from C & NW concerning the specifics of the Minneapolis position and again asked if she was eligible for separation pay. Mr. Heifner suggested that in order to protect her seniority, she should apply for another extension of her sick leave. He again advised her that as long as there were vacant jobs available in her seniority district, she was not entitled to separation pay under the Protective Agreement.

On April 27, 1989, plaintiff faxed a letter to Mr. Amburn requesting a six-month extension of her leave of absence. In response, C & NW, by letter dated April 28, 1989, provided plaintiff with an application to extend her sick leave. The letter also stated that plaintiff's health insurance coverage had ceased March 16, 1989, because the insurance company had

allegedly not received authorization from plaintiff's doctor to extend her disability beyond that date.

Plaintiff completed the application for extended sick leave on or around May 2, 1989, and submitted it to C & NW. C & NW approved plaintiff's request and her sick leave was extended from May 5, 1989, to November 5, 1989.

In March, 1989, plaintiff had become eligible for full retirement benefits from the Railroad Retirement Board as well as a continuation of C & NW health insurance benefits until age 65 because she was 62 years old and had had at least 30 years of service with C & NW. Plaintiff applied for retirement on May 19, 1989, and thereby relinquished her seniority rights.

On June 8, 1989, plaintiff's attorney wrote to General Chairman Heifner requesting that TCU pursue plaintiff's alleged right to receive severance pay from C & NW. The letter also stated that if TCU declined to pursue the action on plaintiff's behalf that plaintiff wished to file a grievance. By letter dated July 25, 1989, Mr. Heifner responded that under the terms of the Protective Agreement, plaintiff's claim for severance pay was without merit and that, in any case, plaintiff's grievance was at that point untimely since she should have filed a grievance with C & NW within 60 days of the complained of action by C & NW.

Plaintiff filed a charge of age discrimination with the State of Kansas Commission on Civil Rights ("KCCR") against C & NW on April 20, 1989, which was then amended on May 17, 1989. Plaintiff also filed a charge of age discrimination against TCU on June 13, 1989. Plaintiff had previously filed a charge of age discrimination against C & NW on November 15, 1985, in response to a threatened abolishment of her position as chief service clerk. [4] Plaintiff filed this lawsuit on September 25, 1989.

### III. DISCUSSION

#### A. ADEA CLAIM

#### 1. AS AGAINST PLAINTIFF'S FORMER EMPLOYER

Count I of plaintiff's complaint alleges that defendant C & NW discriminated against her on the basis of age by constructively discharging her, by wrongfully refusing to pay her any severance pay, and by retaliating against her for having filed an age discrimination charge in 1985. Plaintiff

Appeal: 14-1854    Doc: 21    Filed: 01/26/2015    Pg: 59 of 74

Nicolaisen v. Chicago and Northwestern Transp. Co., Not Reported in F.Supp. (1991)

1991 WL 237619, 138 L.R.R.M. (BNA) 2863, 57 Fair Empl.Prac.Cas. (BNA) 468

also charges defendant TCU with age discrimination for having allegedly actively participated in or allowed C & NW to discriminate against her. Plaintiff seeks monetary damages, including liquidated damages and back pay, as well as reinstatement or in the alternative, front pay. The court will first address plaintiff's ADEA claim against C & NW.

**\*5** The ADEA prohibits an employer from discriminating against any individual with respect to his or her compensation, terms, conditions, or privileges of employment because of such individual's age. 29 U.S.C. § 623(a)(1). In order to establish age discrimination under the ADEA, a plaintiff must prove that age was a determining factor in defendant's treatment of her. *See Perrell v. FinanceAmerica Corp.,* 726 F.2d 654, 656 (10th Cir.1984) (quoting *Loeb v. Textron, Inc.,* 600 F.2d 1003 (1st Cir.1979)). Plaintiff need not prove that age was the sole reason for the employer's acts, but she must demonstrate that age "made the difference" in the employer's decision. *E.E.O.C. v. Prudential Fed. Sav. & Loan Ass'n,* 763 F.2d 1166, 1170 (10th Cir.), *cert. denied,* 474 U.S. 946 (1985). Plaintiff first has the burden of establishing a prima facie case of discrimination under the standards set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248 (1981). If a prima facie case is established, the employer must articulate a legitimate, nondiscriminatory reason for the action taken. *Burdine,* 450 U.S. at 254. Plaintiff must then demonstrate that the employer's articulated reason is a mere pretext for unlawful discrimination. *Id.* at 256. The overall burden of persuasion remains with plaintiff. *Id.*

A plaintiff establishes a prima facie case of age discrimination by showing that (1) she was in the age group protected by the ADEA; (2) she was adversely affected by the defendant's employment decision; (3) she was qualified for the positions at issue; and (4) she was replaced by a younger person. *Cooper v. Asplundh Tree Expert Co.,* 836 F.2d 1544, 1547 (10th Cir.1988). In the context of a reduction-in-force or job abolishment, plaintiff is not required to show that she was replaced by a younger employee, but she must show that "the employer intended to discriminate in reaching the decision at issue." *Branson v. Price River Coal Co.,* 853 F.2d 768, 771 (10th Cir.1988) (citation omitted). This element may be established " 'through circumstantial evidence that the plaintiff was treated less favorably than younger employees during the reduction-in-force.' " *Lucas v. Dover Corp., Norris Div.,* 857 F.2d 1397, 1401 (10th Cir.1988) (quoting *Branson,* 853 F.2d at 771)).

It is uncontroverted that under the terms of the "Protective Agreement" plaintiff could not receive severance pay as long as a there was a vacant position in her seniority district. It is also uncontroverted that the position in Portland, Oregon, in plaintiff's seniority district remained unfilled at the time that plaintiff took retirement in May of 1989. By retiring, plaintiff relinquished all of her seniority rights including the right to receive severance pay. Therefore, plaintiff was not eligible at any time to receive severance pay and she has failed to establish a prima facie case of discrimination under the standards of *McDonnell Douglas.*

**\*6** However, the criteria set out in *McDonnell Douglas* is merely a guideline and was not intended to be rigid, mechanized, ritualistic, or the exclusive method of proving a claim of age discrimination. *See DeHues v. Western Elec. Co.,* 710 F.2d 1344, 1347 (8th Cir.1983); *Schwager v. Sun Oil Co.,* 591 F.2d 58, 61 n. 1 (10th Cir.1979). There is evidence that other employees whose jobs were abolished in September, 1988, September, 1989, and November, 1991, received separation pay despite a lack of evidence that the Portland, Oregon position was ever filled. Defendant C & NW has submitted a supplemental affidavit which states that all of these employees were entitled to severance pay. However, I find that defendant C & NW's bald statement that the employees were eligible is conclusional and not supported by evidentiary details which allow the court to conclude that these employees were indeed qualified. Furthermore, there is evidence that C & NW was not willing to grant severance pay and that TCU had to negotiate a deal for severance pay in September, 1989. It is also uncontroverted that all of the employees who received severance pay in September, 1989, were younger than plaintiff. The court concludes that there is a material question of fact as to whether younger employees were treated more favorably than plaintiff with respect to receiving severance pay after their jobs were abolished. Summary judgment as to plaintiff's claim of disparate treatment on the basis of her age is denied.

Plaintiff also alleges that C & NW retaliated against her for having filed a charge of age discrimination in 1985, in violation of section 4(d) of the ADEA. In order to establish a prima facie case of retaliation, plaintiff must demonstrate (1) she engaged in protected activity; (2) adverse action by the employer contemporaneously or subsequent to the employee's protected activity; and (3) a causal connection between such activity and the employer's action. *Anderson v. Phillips Petroleum Co.,* 861 F.2d 631, 634 (10th Cir.1988). In

Appeal: 14-1854    Doc: 21    Filed: 01/26/2015    Pg: 60 of 74

Nicolaisen v. Chicago and Northwestern Transp. Co., Not Reported in F.Supp. (1991)

1991 WL 237619, 138 L.R.R.M. (BNA) 2863, 57 Fair Empl.Prac.Cas. (BNA) 468

this case, plaintiff has presented no evidence that defendant C & NW's actions in 1988, and 1989, were causally related to plaintiff's having filed a charge of discrimination in 1985. Therefore, summary judgment is granted in favor of defendant C & NW on plaintiff's claim for retaliation.

Finally, plaintiff claims that she was forced to retire and was thereby constructively discharged by the discriminatory "barriers" to returning to work raised by C & NW, including being required to obtain a release from C & NW's doctor before returning to work, receiving conflicting information concerning continuation of her health insurance benefits, not receiving enough information about bumping into the Minneapolis position and other available jobs, and being sued for overpayment of sick leave benefits.

A finding of constructive discharge turns on whether the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign. *Derr v. Gulf Oil Corp., 796 F.2d 340, 344 (10th Cir.1986).* Moreover, " '[a] finding of constructive discharge depends on whether a reasonable person would view the working conditions as intolerable, not upon the subjective view of the employee-claimant.' " *Id. at 343* (quoting *Irving v. Dubuque Packing Co., 689 F.2d 170, 172 (10th Cir.1982)*). The fact that plaintiff was on medical leave of absence prior to taking retirement does not prevent her from bringing a claim of constructive discharge.

 *7  In the present case, it is uncontroverted that requiring plaintiff to submit to a company medical exam and requiring release by the C & NW medical department prior to allowing plaintiff to return to work is standard company procedure. This procedure is not a discriminatory barrier and cannot be considered by any reasonable person to be an intolerable "working condition."

As for plaintiff's claim concerning conflicting information about health insurance coverage, regardless of what plaintiff was told, it is uncontroverted that her health insurance coverage did continue until the date of retirement and also thereafter since it was "intact" as of the date of her retirement. However, plaintiff claims that the threat of cancellation of her health insurance forced her to retire in order to protect her insurance benefits. The court believes that there is a material question of fact as to whether plaintiff was actually threatened with cancellation of her medical insurance and whether the alleged threat would cause a reasonable person to retire.

Plaintiff also alleges that she was deterred from returning to work because she did not receive enough information from C & NW about other jobs which were available to her and because C & NW sought to recover overpayment of sick leave benefits. Again, I find that there are material questions of fact as to what transpired between plaintiff and defendant C & NW and whether a reasonable person would have felt compelled to retire instead of returning to work. Therefore, summary judgment on plaintiff's claim for constructive discharge is denied.

## 2. AS AGAINST PLAINTIFF'S FORMER UNION

As for plaintiff's ADEA claim against her former union, TCU, the ADEA provides in pertinent part that it is unlawful for a labor organization "to discriminate against any individual because of his age [or] to cause or attempt to cause an employer to discriminate against an individual" because of his age. *29 U.S.C. §§ 623(c)(1)* and *(c)(3)*. However, the remedial scheme of the ADEA does not permit actions to recover monetary damages, including back pay, against a labor organization. *Air Line Pilots Ass'n, Int'l v. Trans World Airlines, Inc., 713 F.2d 940, 957 (2d Cir.1983), aff'd in part and rev'd in part on other grounds, sub nom.TWA v. Thurston, 469 U.S. 111 (1985); Neuman v. Northwest Airlines, Inc., 28 Fair Empl.Prac.Cas. (BNA) 1488, 1490– 91 (N.D.Ill.1982); cf. Marshall v. Eastern Airlines, Inc., 474 F.Supp. 364, 367 (S.D.Fla.1979)* (holding that there is no legal basis for recovery by employer against labor organization for contribution under the ADEA); *Brennan v. Emerald Renovators, Inc., 410 F.Supp. 1057 (S.D.N.Y.1975)* (same). In enacting the ADEA, Congress incorporated the remedial scheme of the Fair Labor Standards Act ("FLSA"), *29 U.S.C. §§ 201–218. Lorillard v. Pons, 434 U.S. 575, 582 (1978).* Unions are not liable for monetary damages under the FLSA. *See 29 U.S.C. §§ 203(d), 216(b).* Accordingly, plaintiff's ADEA claim against TCU for monetary damages is dismissed. Summary judgment is granted in favor of TCU as to Count I of the complaint.

## B. DUTY OF FAIR REPRESENTATION CLAIM

 *8  In Count III of her complaint, plaintiff contends that defendant TCU breached its duty of fair representation by not assisting plaintiff in her attempt to relocate to another position on her seniority roster, to be "free" from C & NW's request for repayment of sick leave benefits, or to obtain severance pay after her job was abolished. Plaintiff further alleges that TCU did not inform plaintiff of her rights to pursue a grievance and

Appeal: 14-1854    Doc: 21    Filed: 01/26/2015    Pg: 61 of 74

Nicolaisen v. Chicago and Northwestern Transp. Co., Not Reported in F.Supp. (1991)

1991 WL 237619, 138 L.R.R.M. (BNA) 2863, 57 Fair Empl.Prac.Cas. (BNA) 468

wrongfully refused to pursue plaintiff's grievance concerning C & NW's denial of severance pay. I conclude that plaintiff's failure to exhaust her mandatory internal union remedies bars her fair representation claim against TCU.

Exhaustion of internal union remedies is a prerequisite for bringing a fair representation suit. *Clayton v. UAW,* 451 U.S. 679, 689 (1981); *Fizer v. Safeway Stores, Inc.,* 586 F.2d 182, 183–84 (10th Cir.1978); *Varra v. Dillon Companies, Inc.,* 615 F.2d 1315, 1317 (10th Cir.1980); *Rader v. United Transp. Union,* 718 F.2d 1012, 1014 (11th Cir.1983). The TCU Constitution provides that members must exhaust TCU's internal appeals process before filing suit. TCU Constitution, Art. 5, Sec. 2(c). The TCU Protective Laws set forth the appeals procedure whereby members can appeal a General Chairman's handling of a member's grievance if the member is dissatisfied with the General Chairman's decision. TCU Protective Laws, Art. 1, Sec. 17. Appeal is first made to the System Board Appeals Committee and thereafter to the TCU International President and then to the Executive Council of TCU. *Id.,* Sec. 17(b). In the case where an officer of TCU declines to handle an employee's grievance against the employer, the union, at the request of the employee, is required to request an extension of time for filing the grievance so as to enable the employee to appeal the union's decision without endangering his grievance by the time limits of the collective bargaining agreement. *Id.,* Sec. 17(f).

Plaintiff contends that she should be excused from exhaustion of her internal union remedies because she was not aware of TCU's appeals procedures and because resort to this process would have been futile. Plaintiff's alleged ignorance of the availability of internal union remedies does not excuse her failure to exhaust those remedies. *Monroe v. UAW,* 723 F.2d 22, 26 (6th Cir.1983) (duty to pursue union appellate rights even though ignorant that they can result in full relief); *Miller v. General Motors Corp.* 675 F.2d 146, 150 (7th Cir.1982) (duty to know union appeal rights). Moreover, in *Fristoe v. Reynolds Metals Co.,* 615 F.2d 1209, 1214 (9th Cir.1980), the Ninth Circuit held that a union member's ignorance of the appeals procedure did not excuse his failure to exhaust internal union remedies despite the fact that the union failed to inform him of the existence of such appeals process once the union decided not to process his grievance.

In the case before the court, it is uncontroverted that plaintiff received copies of TCU's monthly magazine, *Interchange,* which notified union members of their duties concerning the filing of grievances and appeals of grievances. The fact that

plaintiff may not have read the magazine does not excuse her from her duty to be aware of her union appeal rights and her obligation to attempt to use and exhaust TCU's internal appeals process.

**\*9** As stated above, plaintiff also contends that resort to TCU's appeal procedures would have been futile. This is based on the fact that when General Chairman Heifner refused to pursue plaintiff's grievance concerning separation pay, he stated that plaintiff's grievance would be time-barred under the rules of the collective bargaining agreement.

In *Clayton,* the Supreme Court discussed the futility exception to the requirement that a union member exhaust her internal union remedies. The Court stated that:

courts have discretion to decide whether to require exhaustion of internal union procedures. In exercising this discretion, at least three factors should be relevant: first, whether union officials are so hostile to the employee that he could not hope to obtain a fair hearing on his claim; second, whether the internal union appeals procedures would be inadequate either to reactivate the employee's grievance or to award him the full relief he seeks under § 301; and third, whether exhaustion of internal procedures would unreasonably delay the employee's opportunity to obtain a judicial hearing on the merits of his claim.

*Clayton,* 451 U.S. at 689; *see also Varra,* 615 F.2d at 1316–17.

In this case, plaintiff has presented no evidence that TCU's appeals process would be unfair or unreasonable or that it would unreasonably delay her opportunity to obtain a judicial hearing. Plaintiff does, however, allege that the appeals procedure is inadequate to reinstate her grievance since her grievance was already untimely. The court finds that, unlike the union in *Clayton,* TCU was not responsible for plaintiff's untimely request to file a grievance. If plaintiff had presented her grievance in writing to TCU in a timely manner, TCU could have protected plaintiff's right to file a grievance by requesting an extension of time during the internal appeals process. *See Clayton,* 451 U.S. at 691 n. 18. Thus, the alleged futility of plaintiff's internal union remedies results from plaintiff's own inaction and not from the inadequacy of the procedures themselves. As in *Fizer,* the fact remains that plaintiff "never actually filed any charges in accordance with the [union] constitution and therefore never gave the system a chance to work." *Fizer,* 586 F.2d at 184. The court finds that

Appeal: 14-1854    Doc: 21    Filed: 01/26/2015    Pg: 62 of 74

Nicolaisen v. Chicago and Northwestern Transp. Co., Not Reported in F.Supp. (1991)

1991 WL 237619, 138 L.R.R.M. (BNA) 2863, 57 Fair Empl.Prac.Cas. (BNA) 468

plaintiff has failed to show that it was futile for her to pursue her internal union remedies and that her fair representation claim against TCU is barred by her failure to exhaust these remedies.

Moreover, I conclude that, under the facts of this case, plaintiff has failed to sustain her burden of proof concerning TCU's breach of its duty of fair representation. The duty of fair representation requires that a union's conduct toward its members be neither "arbitrary, discriminatory [n]or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 190 (1967). Although "a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion, ... the individual employee [does not have] an absolute right to have his grievance taken to arbitration regardless of the provisions of the applicable collective bargaining agreement." *Id.* at 191.

 *10   To establish bad faith or discrimination, the union member must adduce "substantial evidence of fraud, deceitful action or dishonest conduct." *Hoffman v. Lonza, Inc.,* 658 F.2d 519, 524 (7th Cir.1981). Similarly, when mere lack of diligence is alleged, the employee must show something more than mere negligence. *Id.* at 523. In this case, plaintiff has not presented evidence that TCU's handling of her concerns were fraudulent, deceitful, dishonest or driven by intentional bad faith or hostility. In defending against a motion for summary judgment, plaintiff "may not rest on mere allegation or denials of [her] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256. Plaintiff's conclusory allegations of "arbitrary," "discriminatory" and "perfunctory" conduct on the part of the union simply do not meet her burden of demonstrating that TCU's conduct was "so far outside a 'wide range of reasonableness' ... as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill,* 111 S.Ct. 1127, 1130 (1991) (citation omitted). Moreover, as to TCU's refusal to process plaintiff's grievance concerning separation pay, plaintiff has presented no evidence that TCU's interpretation of the relevant provisions of the collective bargaining agreement was an unreasonable construction or even incorrect. *See Rupe v. Spector Freight Systems, Inc.,* 679 F.2d 685, 692–93 (7th Cir.1982) (union's interpretation need not be correct in ultimate analysis as long as it is at least a reasonable construction and is impartial) (analyzing *Tedford v. Peabody Coal Co.,* 533 F.2d 952 (5th Cir.1976)). Therefore, summary judgment is granted in favor of TCU on Count III of plaintiff's complaint.

## C. BREACH OF COLLECTIVE BARGAINING AGREEMENT CLAIM

In Count II of her complaint, plaintiff contends that C & NW breached the collective bargaining agreement by attempting to recoup the alleged overpayment in sick benefits, by not providing her with information about the Minneapolis position, by denying her separation pay and by generally ignoring her seniority rights. Plaintiff states that jurisdiction for this claim is based on Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.

As an initial matter, the court finds that plaintiff's reliance upon the LMRA as a basis for subject matter jurisdiction and as substantive law is misplaced. Employees subject to the Railway Labor Act are specifically excluded from coverage under the LMRA. *See* 29 U.S.C. § 142(3); 29 U.S.C. § 152(3); *Sheehan v. Union P.R. Co.,* 576 F.2d 854, 855 (10th Cir.1978), *rev'd on other grounds, Union P.R. Co. v. Sheehan,* 439 U.S. 89 (1978). However, even if plaintiff was allowed to amend her complaint to assert jurisdiction under the RLA, the court would lack jurisdiction to hear plaintiff's breach of collective bargaining agreement claim.

When an employee sues her employer for violation of a collective bargaining agreement, the employee is usually required to exhaust her contractual remedies by filing a grievance with the National Railroad Adjustment Board ("NRAB") before resort to the courts is permitted. *See, e.g., Richins v. Southern Pacific Co.,* 620 F.2d 761, 762 (10th Cir.1980), *cert. denied,* 449 U.S. 1110 (1981). However, plaintiff's action for breach of the collective bargaining agreement against her former employer and for breach of the duty of fair representation against her former union is classified as a "hybrid" case for purposes of federal court jurisdiction.

 *11   A hybrid case is based on the theory that the employer and the union allegedly combined in some way to obtain or maintain the discharge. *Hodges v. Atchison, T. & S.F.R. Co.,* 728 F.2d 414, 417 (10th Cir.), *cert. denied,* 469 U.S. 822 (1984). In *Richins,* the Tenth Circuit held that in hybrid cases where the claims against the railroad and the union are not "so easily separable as to warrant bifurcating the proceeding—with the claim against the Railroad presented to the [National Railroad Adjustment] Board and the fair representation claim heard in federal court," federal courts have jurisdiction over the entire case. *Richins,* 620 F.2d at 762–63. [5]

Appeal: 14-1854     Doc: 21     Filed: 01/26/2015     Pg: 63 of 74

Nicolaisen v. Chicago and Northwestern Transp. Co., Not Reported in F.Supp. (1991)

1991 WL 237619, 138 L.R.R.M. (BNA) 2863, 57 Fair Empl.Prac.Cas. (BNA) 468

In the case at hand, since summary judgment is granted in favor of TCU as to plaintiff's fair representation claim, plaintiff's action is no longer a hybrid case under *Richins* and is a "minor" employer-employee dispute as defined by the following:

If this suit had been brought against the Railroad only, we would have no difficulty in determining the proper disposition. The dispute between plaintiffs and the Railroad is clearly a "minor" one—that is, "between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 153 First (i). As the Supreme Court has emphatically told us, "Congress considered it essential to keep these so called 'minor' disputes within the Adjustment Board and out of the courts." *Union Pacific Railroad v. Sheehan,* [*supra* ].

*Richins,* 620 F.2d at 762.

In the present case, plaintiff's dispute with C & NW concerning her alleged constructive discharge and her seniority rights clearly "grow[s] out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 153 First (i). Thus, the RLA requires that plaintiff's dispute be arbitrated before the NRAB. *See, e.g., Walker v. Southern R. Co.,* 385 U.S. 196 (1966).

In *Andrews v. Louisville & N.R. Co.,* 406 U.S. 320 (1972), the Supreme Court specifically rejected the contention of a railroad employee that he was entitled to pursue a suit in federal court without first exhausting the remedies available to him under the RLA. *See also Republic Steel Corp. v. Maddox,* 379 U.S. 650, 652 (1965). Here, it is uncontroverted that plaintiff never filed a grievance against C & NW with C & NW, TCU or the NRAB and never attempted to arbitrate her grievances before the NRAB.

Moreover, plaintiff has not shown that her failure to exhaust her contractual and statutory grievance remedies was excusable. The fact that TCU declined to process plaintiff's grievances did not prevent plaintiff from exhausting her contractual grievance procedures, since unlike the National Labor Relations Act where the union has the "sole power" to invoke such procedures, the RLA provides plaintiff with the

statutory right to process her own grievances up through and including arbitration before the NRAB. 45 U.S.C. § 153 First (i). In addition, various provisions of the collective bargaining agreement between C & NW and TCU permit employees to process grievances against C & NW on their own without TCU's involvement. C & NW Collective Bargaining Agreement, Rules 22 and 35; Protective Agreement, Art. XI. Finally, plaintiff's alleged ignorance of her contractual and statutory rights and TCU's alleged failure to inform plaintiff of her rights do not excuse plaintiff's failure to exhaust her contractual and statutory grievance remedies since plaintiff has a duty to be knowledgeable concerning the collective bargaining agreement grievance procedures. *See, e.g., Roman v. United States Postal Service,* 821 F.2d 382, 390 (7th Cir.1987).

**\*12**  Since the RLA mandates arbitration of minor employee-employer disputes and since plaintiff has not shown that exhaustion of her contractual grievance remedies was futile, this court lacks jurisdiction to hear plaintiff's breach of collective bargaining agreement claim. Therefore, summary judgment is granted in favor of defendant C & NW as to Count II of plaintiff's complaint.

IT IS, THEREFORE, BY THE COURT ORDERED that defendant Transportation Communications International Union's motion for summary judgment (Doc. 75) is granted. Defendant TCU is hereby dismissed. Count III of plaintiff's complaint and Count I of plaintiff's complaint, insofar as it relates to defendant TCU, are hereby dismissed.

IT IS FURTHER ORDERED that defendant Chicago and Northwestern Transportation Company's motion for summary judgment (Doc. 79) is granted as to Count II of plaintiff's complaint and denied as to Count I of plaintiff's complaint. Count II of plaintiff's complaint is hereby dismissed.

Copies of this order shall be mailed to counsel of record for the parties.

IT IS SO ORDERED.

**Parallel Citations**

138 L.R.R.M. (BNA) 2863, 57 Fair Empl.Prac.Cas. (BNA) 468

**Nicolaisen v. Chicago and Northwestern Transp. Co., Not Reported in F.Supp. (1991)**

1991 WL 237619, 138 L.R.R.M. (BNA) 2863, 57 Fair Empl.Prac.Cas. (BNA) 468

Footnotes

1    C & NW has counterclaimed for an alleged overpayment of medical leave benefits. However, C & NW is not seeking summary judgment on its counterclaim.

2    TCU was formerly known as the Brotherhood of Railway, Airline and Steamship Clerks ("BRAC").

3    Mr. Van Kleek was General Chairman of TCU's Midcontinent System Board of Adjustment No. 26, an intermediate level unit of TCU. Upon retiring on October 1, 1988, Mr. Van Kleek was succeeded by General Chairman Ernest L. Heifner.

4    Plaintiff's complaint was based on the fact that while her position as chief service clerk was to be abolished, C & NW planned to retain a younger employee in a steno-clerk position which was a lower position than hers.

5    The Tenth Circuit specifically found that *Union P.R. Co. v. Sheehan,* 439 U.S. 89 (1978), does not repudiate those portions of *Glover v. St. Louis–San Francisco R. Co.,* 393 U.S. 324 (1969) and *Czosek v. O'Mara,* 397 U.S. 25 (1970) which uphold federal court jurisdiction of hybrid cases.

---

**End of Document**                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Appeal: 14-1854      Doc: 21      Filed: 01/26/2015      Pg: 65 of 74

IN THE MATTER OF ARBITRATION BETWEEN StarTran,..., 2002 WL 35018627...

2002 WL 35018627 (Arbitrator Submitted Award)

Arbitrator Submitted Award

IN THE MATTER OF ARBITRATION BETWEEN StarTran, Inc.
Employer and Amalgamated Transit Union Local 1091, Union

FMCS No. 01-15678
Grievance No. 00-047
September 16, 2002

**\*1  Case Type: Labor**
**Award Date: September 16, 2002**
 **\*8  Arbitrator: Don J. Harr, Arbitrator**
**For the Employer: Kent McCulloch**
**For the Union: Glenda L. Pittman, Esq., Bella M. Fink, Esq. and Leila C. Feldman, Esq.**

C, Grievant

INTRODUCTION:

Pursuant to the Collective Bargaining Agreement between the parties, effective July 1, 2000, Article 19, the undersigned was selected as arbitrator to hear and render a decision in the above referenced grievance through the procedures of the Federal Mediation and Conciliation Service.

Hearing was held at the Embassy Suites Hotel, 300 South Congress, Austin, Texas on February 19, 2002. Both parties were represented by learned and capable counsel. The parties were given the opportunity to make opening statements, present evidence and exhibits, present and cross examine witnesses and make closing arguments. Initially, the parties stipulated that there was no question concerning the arbitrability of the grievance and that the grievance was properly before the Arbitrator for a decision.

A Certified Short Hand Reporter was present and a transcript of the hearing was prepared. At the close of the hearing the parties requested and were granted time in which to file post hearing briefs. The time for filing post hearing briefs was extended by agreement; and both briefs had been received by the Arbitrator on May 3, 2002, thus closing the file.

ISSUE:

Was the Grievant, C, discharged for just cause? If not, what is the proper remedy?

BACKGROUND:

The Amalgamated Transit Union, Local Union 1091 and StanTran, Inc. have been parties to successive collective bargaining agreements for many years. The instant grievance involves the termination of Bus Operator, C, as the result of a preventable accident which occurred on October 31, 2000.

Grievance # 00-047 was filed by the Union on November 30, 2000. Grievance # 00-047 states:

'NATURE OF GRIEVANCE

On Wednesday, November 20, 2000, Operator C was terminated for a preventable accident based solely on the severity of the accident and alleged 'negligence' that occurred on October 31, 2000.

The Company is in violation of, but not limited to Article 16C, of the current Labor Contract.


ADJUSTMENT DESIRED

1. Reduction in the disciplinary action to no more than five (5) days suspension without pay from time already spent.

2. Operator is to have one (1) day of retraining with pay.

3. All other time spent off on suspension other than the above five (5) days to be paid based on regular run pay.

4. Operator to be made whole for all time spent off with exception of the five (5) day suspension.'


The grievance was denied by the Company's Regulations and Compliance Superintendent, A, by letter dated December 5, 2000. The Union advanced the grievance to the second step of the grievance procedure on December 13, 2000. Following a hearing on December 27, 2000, Mr. W, Labor Coordinator for StarTran, Inc. denied the grievance by memorandum dated December 28, 2000. The grievance was advanced to third step of the grievance procedure on January 2, 2001. A hearing was held on January 17, 2001 and the grievance was denied by the Company's Manager of Labor Relations, Mr. M. In his letter of January 25, 2001 Mr. M stated:

 *2  'At the hearing, you made the point that Mr. C had an excellent work record over a long tenure and that one incident should not result in his termination. You also noted that Mr. C had provided valuable service on the safety committee helping to reduce the incident of accidents. Mr C said that he needs his position with StarTran, that he has obligations to fulfill and that he is sorry this accident happened.

The facts show that the accident was preventable. Therefore, based on the severity of the accident, I am forced to conclude that, notwithstanding Mr. C's prior work record, the termination must be upheld. Accordingly, for the foregoing reasons and those set forth in the previous answers to the grievance, the grievance is denied.'


Subsequently, the Union advanced the grievance to arbitration. The Grievant was employed by the Company as a Fixed Route Bus Operator. He began his employment with the Company's predecessor on or about January 8, 1986. Until October 31, 2000 the Grievant's employment as a bus driver was relatively uneventful. During the course of his employment, in addition to performing his duties as a bus operator, the Grievant participated in many safety-related activities. For approximately ten years he participated in the StarTran safety committee and, at different times, served as the committee's secretary and chairperson. He also served as an instructor and an acting dispatcher. During his employment, he received a number of awards and commendations. Although he did have preventable accidents in 1994 and 1999, his record does not indicate any significant safety-related issues.

On October 31, 2000 an accident occurred just north of the intersection of Dean Keeton (26th Street) and Guadalupe Street. The accident involved a bicyclist named P and the bus driven by the Grievant.

The route to which the Grievant was assigned on October 31, 2000 went through the University of Texas campus area, where pedestrian and bicycle traffic is considerably higher than in non-university areas. At the arbitration hearing, the Grievant testified that: as a result of his experience driving routes in university areas, he had developed a general practice of always giving bicyclists the right-of-way, giving them enough room, and never following closer than a car length.

Appeal: 14-1854    Doc: 21    Filed: 01/26/2015    Pg: 67 of 74

IN THE MATTER OF ARBITRATION BETWEEN StarTran,..., 2002 WL 35018627...

At approximately 10:45 AM on October 31, when the Grievant had completed about one and one half rounds of his route and was driving north on Guadalupe Street, he serviced a bus stop in the University of Texas campus area at the intersection of Guadalupe and Dean Keeton after the traffic light at that intersection had just turned red. Once the passengers had boarded his bus, the Grievant shut the door and traffic light turned green. He testified that, after looking left and right, checking his mirrors and making sure nobody was crossing in the street in front of the bus, he proceeded driving north on Guadalupe through the intersection.

When he reached three quarters of the way a cross the intersection and was perpendicular to the west bound lane of Dean Keeton, looking through the front window on the front side door of the bus, he saw a female bicyclist to the right side of the bus, perceiving her to be riding west on Dean Keeton and making a right turn to continue north on Guadalupe. It appeared to the Grievant that the bicyclist ran a red light at the intersection of Dean Keeton and Guadalupe because she did not stop at the traffic light as she traveled west on Dean Keeton and then north on to Guadalupe at the same time that the north bound traffic on Guadalupe had a green light.

 **\*3**  The Grievant was not aware that a accident had occurred until an individual motorist pulled in front of the bus, cutting the bus off and causing the Grievant to bring the bus to a stop, The motorist approached the front door of the bus and advised the Grievant that someone was lying on the street behind the bus. The Grievant testified that at no point before the accident had he felt a collision, any impact, or a sensation of striking something with the bus. After the accident he saw the same bicyclist lying behind the bus in the right-hand lane of Guadalupe Street and observed her bicycle against a retaining wall on the adjacent sidewalk. As soon as he realized that an accident had in fact occurred, he followed the required Company protocol and reported the accident on his radio, explaining the need for the Austin Police Department and Emergency Medical Services to report to the scene. He followed company protocol by completing an accident report form and passing out courtesy cards to potential witnesses. On the second and third pages of the accident report form, he wrote that he 'secured the name of two witnesses. Both the witnesses stated they saw everything that happened and said the cyclist had been at fault.'

One witness, A, testified through an interpreter at the arbitration hearing. She testified that she was sitting next to the window on the right side of the bus, about three or four seats from the front, when the accident occurred. She saw a bicyclist on the sidewalk on the right side of the bus at the intersection of Dean Keeton and Guadalupe Street while the bus was stopped at the bus stop. The bicyclist and the bus were both stopped at the red light and then proceeded through the intersection when the traffic light turned green. She last had sight of the bicyclist as the bus was crossing the intersection and the bicyclist was toward the back of the bus. She testified that at no point did she see the bicyclist in front of the bus. She did not feel any sensation of the bus striking something before it came to a stop, nor did she hear any sound that could indicate contact between the bicyclist and the bus. She was not aware that an accident had occurred until a vehicle pulled in front of the bus, causing the bus to stop, and saw a person get out of the car and tell the Grievant that something had happened. After the accident, she saw the same bicyclist lying on Guadalupe Street behind the bus and her bicycle on the sidewalk. She did not observe any damage to the bicycle following the accident.

Apparently, the injuries suffered by Ms. P were extremely serious. The Company received information that Ms. P required numerous medical procedures as a result of her injuries. These injuries resulted from her legs being run over by the right rear wheels of the bus driven by the Grievant.

The Grievant was placed on suspension without pay by memorandum dated October 31, 2000. A hearing was held thereafter which was attended by Regulations and Compliance Superintendent A, Labor Relations Manager M, W, and Union representatives M and C.

 **\*4**  While on suspension, the Grievant elected to appeal the preventability determination that had been made by Supervisor C to the Accident Review Board. An 'Emergency Accident Review Board' was constituted and a hearing was held on November 29, 2000. The Board vote was split evenly between the Company and Union representatives. Consequently, the decision was

made by Accident Review Board Chairman Lt. C of the Austin Police Department who elected to uphold the determination that the accident was preventable. Following the decision of the Accident Review Board, Ms. A notified the Grievant that his employment with StarTran was terminated due to 'severity of the injuries and the negligence involved.'

OPINION:

The relevant provisions of the Collective Bargaining Agreement read:

### ARTICLE 4: MANAGEMENT RIGHTS

A. Generally: The Employer shall have the full and exclusive authority to determine and direct the policies, procedures, and methods of operating its business. The Employer retains the sole right to discipline and discharge employees for just cause, provided that it does not violate the terms of this Agreement. In addition, the Employer reserves all of the inherent rights it had to manage its business before the execution of this Agreement, except as modified in this Agreement.

B. Examples of Management Rights: The sole and exclusive rights of Management which are not abridged by this Agreement include, the rights to:

* * * * *

8. Reprimand, discharge, or otherwise discipline employees for just cause.;'

### ARTICLE 15: SAFETY, INFORMATION, POLICY

### AND PROCEDURES

* * * * *

E. Accident and Incident Reports: All vehicle and industrial accidents or incidents must be immediately reported via radio or to the employee's immediate supervisor. In the case of Maintenance employees, the report shall be made to the immediate supervisor on duty. All employees shall properly complete written accident or incident reports, as required by the Employer. Failure to comply with the reporting requirements shall result in discipline up to and including discharge. Reports must be completed and turned in the same day as the accident or incident.

In extenuating circumstances (such as incapacitation of the employee), reports may be submitted later, but must be submitted as soon as possible. Transportation employees shall be paid for 30 minutes for completing reports under this section. The overtime provision of the Agreement shall apply to this section.

Preventable Accident/Accident Review Board: The Employer may conduct an investigation of any vehicular or industrial accident or incident, including on-site investigation and other data collection. Upon investigation, or receipt of a verbal or written report, the Employer shall, within one working day, issue to the employee, with a copy to the Union, a written determination as to whether the acccident/incident was preventable or not.

Discipline for preventable accidents: Three preventable accidents in a rolling 12 month period will result in discipline up to and including discharge depending on the severity of the accident, and the degree of the employee's negligence associated with the accident.

**\*5**  1. Accident Review Board: An employee may appeal a preventable decision to an Accident Review Board (ARB) composed of two Employer representative, two Union representative, and a neutral third-party with accident investigation experience. The parties shall agree on the neutral and on two alternates. Either side may recall a neutral member. New evidence may be presented to the Board.

2. The ARB shall meet at least every other month to hear accident appeals. However, it the accident involves a discharge, a special meeting of the ARB shall be held as soon as possible, unless the parties agree to postpone it. The majority decision of the ARB shall be final and binding on the parties, except if the employee or the Union discovers additional information which may be cause for changing the determination of the ruling, the employee shall present this information to the Board, which shall make a final and binding decision whether the new information warrants a rehearing of the case.'

ARTICLE 16: DISCIPLINE BY THE EMPLOYER

A. Written Notice of Disciplinary Action: The Employer shall provide specific written notice of charges or rule violations to the Union and the employee within three (3) business days of the Employers' knowledge of the violation of infraction. If the Employer has not provided specific written notice of charges to the employee and the Union within three (3) business days of the Employer's knowledge, violation shall be dropped. No employee shall be disciplined or discharged without just cause according to the provisions of this agreement.
1. The Employer shall have the authority to discipline an employee for an offense in accordance with this Agreement. However, if such discipline is unjustifiable, the employee shall be paid for the lost time the employee would have worked. An investigation must be completed and documentation provided tot he affective employee with copies to the Union.

* * * * *

4. Types of discipline shall include oral reminder(s)/warning(s), written reminder(s)/(warning(s), disciplinary probation(s), suspension(s), and discharge. Employees who are suspended or discharged shall be entitled to a fair and impartial hearing, at which time both sides shall present any pertinent information. The hearing shall be held as soon as possible, but not on the employee's regularly scheduled day off. Disciplinary hearings shall deal only with the charges against the employee.

5. Written notice of a suspension pending investigation shall be forwarded to the employee and the Union within three (3) business days. The period of employee's suspension pending investigation will be capped at thirty (30) days from the date of the suspension. Upon notice by the Employer to the Union, the Employer will be given an extension of (30) days. If it is determined the employee was improperly suspended or discharged, the Employer shall reimburse the employee any lost wages.

6. Explanations of any disciplinary actions taken against any employee by the Employer shall be given to the affected employee in writing. The Union will be notified in writing of the discipline within three (3) business days after the action has been taken.

**\*6**  B. The Employer will not discipline or discharge any employee without just cause.. * * * * *

C. Just cause: The Employer may discipline or discharge for just cause. The following is a non-exhaustive list of conduct constituting just cause.

* * * * *

5. Posing an immediate or potential danger to public safety or other employees.

11. Violation of the Employer's work rules, including safety rules.'

\* \* \* \* \*

ARTICLE 19: ARBITRATION

A. If a dispute is not resolved through the grievance process in Article 18, the party who filed the grievance (employee, Union, or Employer) may appeal to arbitration by delivering written notice of intent to arbitrate to the opposing party within thirty-five (35) days of the Step 3 decision as follows:

\* \* \* \* \*

> D. In cases if disciplinary action, including discharge, the Arbitrator shall have the right to rescind or modify the penalty and to require compensation to the employee for lost wages in whole or in part, less those earnings, including unemployment compensation, received by the disciplined employee while off active payroll.'

In discipline cases, the Company has the burden of proving its case against the Grievant. The Company must prove each and every element of its case. The Company's failure to prove any element of its case should result in a reversal of the discipline. In most discipline cases, arbitrators render their decision based upon the preponderance of the evidence.

In discipline arbitration cases such as the instant case, where the collective bargaining agreement prohibits discipline without just cause, the employer bears the burden of proving that the employee was discharged for just cause. The Union characterizes this burden as the burden of establishing just cause by clear and convincing evidence. As part of carrying this burden of proof, an employer must establish by clear and convincing evidence that there was a stated or generally known and reasonable work rule or expectation that the terminated employee violated. Some arbitrators have implemented a higher burden of proof where the grievant is alleged to have committed a possible criminal act. The stigma associated with the finding of guilt by an arbitrator justifies, and even compels, a steeper burden of proof.
'In Dobbs Houses Inc. and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America Local 528, 78 LA 749, Arbitrator T, Jr. stated at 752:

'To restate, this arbitrator, in a matter of this type, is of the opinion that the quantum of proof should be guilt beyond a reasonable doubt.

Burden of Proof: 'Burden of Proof is a judicial concept often applied in an arbitrable setting that designates what party has the obligation of establishing by evidence the ultimate fact or issue to be proved. Within the arbitration context the burden of proof contains two separate components: (1) The initial burden of going forward with the evidence, the (2) the burden of persuading the fact-finder concerning the ultimate resolution of some fact or issue.

 **\*7**  Since discharge is the most severe penalty an employer can impose, being equivalent of economic capital punishment, he must bear the burden of justifying such serious move.

Appeal: 14-1854    Doc: 21    Filed: 01/26/2015    Pg: 71 of 74

IN THE MATTER OF ARBITRATION BETWEEN StarTran,..., 2002 WL 35018627...

It seems quite clear that the majority rule of grievance arbitration is that the employer must carry the burden of proof of 'just cause' in a discharge case.

This arbitrator is of the opinion that the burden of proof is on the Company to establish just cause for the suspension and ultimate discharge.'

In their definitive work, How Arbitration Works, BNA Fifth Edition, the Elkiouris state at page 925:

'Grievant's Past Record

> Some consideration is generally given to the past record of any disciplined or discharged employee. An offense may be mitigated by a good past record and it may be aggravated by a poor one. Indeed, the employee's past record often is a major factor in the determination of the proper penalty for the offense.'

Arbitrable standards for just cause discharge were established long ago by Arbitrator D in Enterprise Wire Co., 46 LA 359, 363-65 (1966). In concise form these criteria are as follows:
1. The employee must be forewarned.

2. Employer's position with respect to employee's conduct was reasonable.

3. Employer investigated before discharge.

4. Investigation was fair.

5. Substantial evidence supports the charge against the employee.

6. There was no discrimination.

7. The degree of discipline was reasonably related to the nature of the offense and the employee's past record.

Misco, Inc., 89 LA 137, 144 (F 1983).

In Misco, Inc., as in numerous proceeding awards, the arbitrator relied upon those criteria in sustaining a grievant's challenge to discharge on just cause grounds. The Misco, Inc., award was enforced by the United States Supreme Court in United Paperworkers International Union v. Misco, Inc., 484 U.S. 29(1987). A 'no' answer to any one or more of the above criteria means that just cause for discharge did not exist. Enterprise Wire co., 46 LA at 362. A single 'no' answer means that the company's decision 'contained one or more elements of arbitrary, capricious, unreasonable, or discriminatory action... [and] constituted an abuse of managerial discretion warranting the arbitrator to substitute his judgement for that of the employer.'Id. at 363. The instant record warrants a 'no' answer to one or more of the above criteria. Therefore, the Grievant was not discharged for just cause and should be reinstated in accordance with the terms of the Collective Bargaining Agreement.'

Appeal: 14-1854    Doc: 21    Filed: 01/26/2015    Pg: 72 of 74

IN THE MATTER OF ARBITRATION BETWEEN StarTran,..., 2002 WL 35018627...

To carry its burden of proving that the Grievant was terminated for just cause, the Company has to provide clear and convincing evidence that he violated a stated or generally known and reasonable known work rule or exception. The Company failed to make such a showing. The Agreement specifically sets forth a procedure for determining whether a accident is preventable and also explicitly describes when discipline may be implemented for preventable accidents.

Clearly, the Company made a 'rush to judgment' and failed to conduct a proper investigation. The just cause standard requires an employer to conduct 'a meaningful, more-than-perfunctory factual investigation' to determine that cause, in fact, exists. The investigation on which the Company based its termination of the Grievant was incomplete and perfunctory, and was therefore insufficient to comply with the requirements of the just cause and procedural due process.

The Company's investigation was inadequate in that it failed to explain how the accident occurred. The Grievant was apparently the only eye-witness the Company interviewed and the Company failed to thoroughly question the Grievant or take notes of, or otherwise record the Grievant's description of the accident. The Company presented no evidence of interviews with the bicyclist, the individual in the car who witnessed the accident and informed the Grievant that the bicyclist had been injured, or either of the two passengers on the bus who stated they saw the accident.

Not only was the Company's initial investigation inadequate, the Grievant was denied due process at every step of the grievance and Accident Review Board processes. The Accident Review Board upheld the preventability determination without conducting any further investigation.

Also, the Union introduced evidence demonstrating disparate treatment of employees involved in similar incidents.

AWARD

The Grievant's negligence may have contributed in some degree to the accident. However, any negligence on his behalf does not justify the supreme industrial penalty of termination. The Arbitrator finds adequate reason to substitute his judgement for that of management. The discipline imposed is reduced to a thirty (30) working days suspension.

The Grievant is to be returned to his former position with all back seniority and any and all other benefits of employment including, vacation, medical benefits, retirement benefits and all other benefits to which he is entitled under the terms of the Collective Bargaining Agreement. The Grievant is to be paid back pay in accordance with Article 19, Section D, Supra, of the Collective Bargaining Agreement.

Don J. Harr, Arbitrator

2002 WL 35018627 (Arbitrator Submitted Award)

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B)(iii) because this brief contains 7,338 words, excluding the parts of the

brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

2010 in 14 point Times New Roman.


Dated: January 26, 2015       s/ Tessa A. Warren
                                    Tessa A. Warren

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 26th of January, 2015, the

foregoing was served on the parties listed below by filing a copy with the Clerk of

Court through the CM/ECF system, which will send notice of such filing to the

following registered CM/ECF users:

Jeffrey P. Dunleavy
Stephenson & Murphy, LLC
207 Whitsett Street
Greenville, SC 29601
Counsel for Appellants

I further certify that on this 26th day of January, 2015, I caused the required

copies of the Brief of Appellee to be delivered to Clerk of Court by depositing

same with UPS for overnight delivery.

s/ Tessa A. Warren
Tessa A. Warren
Counsel for Appellees